IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-88

No. 115A04-3

Filed 13 August 2021

STATE OF NORTH CARLOLINA

v.

SCOTT DAVID ALLEN

On writ of certiorari pursuant to N.C.G.S. § 7A-32(b) to review orders dismissing defendant's claims asserted in his motion for appropriate relief entered on 22 August 2016, 8 January 2018, and 6 February 2019 by Judge V. Bradford Long in Superior Court, Montgomery County. Heard in the Supreme Court on 26 April 2021.

*Joshua H. Stein, Attorney General, by Nicholaos Vlahos, Assistant Attorney General, for the State-appellee.*

*Olivia Warren and Michael L. Unti for defendant-appellant.*

EARLS, Justice.

¶ 1    This case involves numerous post-conviction claims raised by defendant Scott David Allen, who was found guilty of the first-degree murder of Christopher Gailey and sentenced to death in Montgomery County in 2003. Allen challenged his conviction and sentence on direct appeal, but this Court unanimously found no error. *State v. Allen*, 360 N.C. 297, 321 (2006). The Supreme Court of the United States denied certiorari. *Allen v. North Carolina*, 549 U.S. 867 (2006). Subsequently, Allen filed a motion for appropriate relief (MAR) in Superior Court, Montgomery County

(MAR court), in July 2007. Six years later, and before the MAR court ruled on his MAR, Allen filed a supplemental motion for appropriate relief (SMAR) amending some of his previous claims and adding two additional claims. The MAR court's dismissal of these claims forms the basis of defendant's petition to this Court.

¶ 2        Of the twelve total claims raised in Allen's MAR and SMAR, five of them directly relate to his allegation that his trial attorneys rendered unconstitutionally ineffective assistance of counsel (IAC) during the guilt-innocence phase of his trial by failing to investigate, develop, and utilize various sources of exculpatory evidence. The evidence Allen presented in support of these claims includes affidavits from acquaintances of Allen and the State's primary witness, Vanessa Smith, implicating Smith in Gailey's murder, as well as a report from a crime scene expert concluding that in light of the physical evidence discovered at the scene of Gailey's death, Smith's account of Gailey's killing was "unfathomable." Notwithstanding this evidence and the centrality of Smith's testimony to Allen's conviction, the MAR court dismissed Allen's guilt-innocence phase IAC claims without conducting an evidentiary hearing to resolve disputed issues of fact.

¶ 3        Based on well-established precedent, we conclude that Allen is entitled to an evidentiary hearing on his guilt-innocence phase IAC claims. Allen has "present[ed] assertions of fact which will entitle [him] to . . . relief . . . if resolved in his favor." *State v. McHone*, 348 N.C. 254, 258 (1998). Therefore, under the statutory framework

governing post-conviction review of criminal convictions in North Carolina, the MAR

court was obligated to conduct an evidentiary hearing prior to ruling on his MAR and

SMAR claims, because "some of his asserted grounds for relief required the [MAR]

court to resolve questions of fact." *Id.* (interpreting N.C.G.S. § 15A-1420(c)(1)).

Accordingly, we vacate the portions of the MAR court's order summarily dismissing

Allen's guilt-innocence phase IAC claims and remand to the MAR court to conduct a

full evidentiary hearing.

In addition, we hold that the trial court erred in summarily ruling that Allen's

claim alleging he was impermissibly shackled in view of the jury was procedurally

barred. On this claim, we vacate the relevant portion of the MAR court's order and

remand for an evidentiary hearing to obtain the facts necessary to determine whether

his claim is procedurally barred and, if not, whether it has merit. We affirm the MAR

court's disposition of all other claims raised in Allen's MAR and SMAR.

## I. Factual Background

### A. Gailey's death and Allen's trial.

In 1998, Allen escaped from a North Carolina Department of Corrections work

release program. Shortly after fleeing, he reunited with Smith, with whom he had

maintained an on-again, off-again romantic relationship. The couple drifted from

hotel to hotel, living off settlement proceeds Smith received after her father's death.

Allen and Smith regularly purchased and used large quantities of illegal drugs

together. To evade detection, Allen obtained a friend's birth certificate and driver's license issued by the State of Washington. While travelling through Colorado, Allen became romantically involved with another woman, and Allen and Smith split up. The former couple returned to North Carolina separately in the spring of 1999. That summer, they began living together in a mobile home owned by a friend, Robert Johnson, near the Uwharrie National Forest. Various friends and acquaintances lived in the mobile home while Smith and Allen resided in it, including Gailey, Allen's friend and sometimes drug dealer.

Sometime during the afternoon of 9 July 1999, Allen, Smith, and Gailey entered the Uwharrie National Forest. At some point that evening, somebody shot and killed Gailey. His body was later found by a passerby driving an all-terrain vehicle. Smith eventually told law enforcement Allen killed Gailey to steal his money and drugs. Both Allen and Smith were charged with murder.

Approximately two weeks before Allen was brought to trial, Smith—who by that time had spent approximately twenty-three months in jail—entered into an agreement with the State. In exchange for her testimony against Allen, the State would drop the murder charges against her, and she would plead guilty to a lesser offense. At trial, Smith testified that Allen was the sole person responsible for Gailey's death and that Allen acted in cold blood. According to Smith, Allen assassinated Gailey by shooting him from behind, unprovoked, as they walked along

a path in the woods.

¶ 8        Because Allen did not testify, Smith provided the sole narrative of the events directly precipitating Gailey's death. As we explained in our decision resolving Allen's direct appeal, Smith was "a witness with less-than-perfect credibility." *Allen*, 360 N.C. at 306. She was a chronic heavy drug user who admitted to smoking marijuana shortly before Gailey's death. She was involved in a tumultuous romantic relationship with Allen which he had recently broken off. She accused Allen of Gailey's murder only after confronting him in Denver, Colorado, where Allen had reunited with a different ex-girlfriend. She testified at the trial pursuant to a deal with the State which significantly reduced her potential criminal liability.

¶ 9        According to Smith's account of events, on 9 July 1999, Allen told her and Gailey he had stashed weapons in a cabin in the Uwharrie National Forest, which he thought they could recover and trade for money and cocaine. The trio left together in Gailey's truck to retrieve the weapons sometime in the afternoon, while it was still light out. The party began walking along a path through the forest. Gailey was carrying a duffel bag and a .45-caliber handgun. Allen carried a sawed-off shotgun. During the walk, Gailey and Allen used powder cocaine. Smith smoked marijuana. Smith testified that after at least an hour of walking, the path narrowed, and the three proceeded single file with Gailey leading the way, followed by Allen and then Smith.

¶ 10        At some point, Allen allegedly turned around, shoved Smith to the ground, and then without provocation began shooting at Gailey with the shotgun. Smith did not see Allen shoot Gailey, but she recounted hearing multiple gunshots. Smith and Allen then waited for "seven or eight hours" in a nearby cabin for Gailey to die. While they were waiting, Allen would periodically crawl towards Gailey's body and throw rocks at him to ascertain whether Gailey was still alive. When Allen and Smith finally left the cabin, they heard Gailey empty his .45-caliber handgun.

¶ 11        Allen and Smith left the forest together in Gailey's truck. Smith retrieved Gailey's wallet and their belongings from the mobile home. The two then drove to Shallotte and then to Albemarle in search of cocaine. However, by this point, Smith's memory had begun to deteriorate due to her drug use.

¶ 12        According to multiple witnesses, Smith and Allen ended up at a party at the home of one of Smith's friends, where they encountered a man named Jeffrey Lynn Page, who would later testify at Allen's trial. According to Page, who had never previously met Allen, Allen admitted that he had just shot a man in the Uwharrie National Forest and was looking to offload the dead man's truck. Allen told Page he had thrown rocks at Gailey's body to confirm he was dead because Allen knew Gailey was armed. Page bought Allen's truck at well below market value and then flipped it to a South Carolina junk dealer for a profit. Like Smith, Page was also charged in connection with Gailey's death—he was indicted for being an accessory after the fact

to Gailey's murder—and testified at Allen's trial pursuant to an agreement with the State.

¶ 13        Sometime after selling Gailey's truck, Allen returned to Denver. Smith testified that one of her former romantic partners, who she reunited with shortly after Gailey's death, loaned her money and a car to travel to Denver[1] where she was able to track down Allen. Allen and Smith fought. Smith returned to North Carolina. Upon her return, Smith went to law enforcement to accuse Allen of murdering Gailey.

¶ 14        Law enforcement officers who examined the crime scene discovered the following evidence:

- A .45-caliber semi-automatic handgun between Gailey's feet, loaded with a magazine containing five live rounds, and one spent .45-caliber shell casing jammed in the receiver;

- A number of live rounds of .45-caliber ammunition next to Gailey;

- A magazine containing live rounds several feet from Gailey's head;

- A black t-shirt draped over a rock with another smaller rock on top of it, approximately four feet from Gailey's body;

- A nylon handgun holster;

- Five expended shotgun shells;

---

[1] The former romantic partner subsequently filed a police report and testified at Allen's trial that rather than loaning Smith the money and her car, Smith stole both items.

- A hunting knife located on top of a duffel bag;

- A yellow container with $1,944.00 in cash on Gailey's body.

According to the State's forensic pathologist, Gailey died from two gunshot wounds, one to the back of his right shoulder from close range and another to his right knee from a further distance. In the pathologist's opinion, Gailey probably lost consciousness "within a matter of minutes" of sustaining his injuries, and it was "extremely unlikely" Gailey survived for more than an hour or two after he was shot.

¶ 15  The State's case rested primarily on the testimony of Smith and Page. No fingerprint, DNA, or forensic evidence connecting Allen to the crime scene was ever produced, nor was the alleged murder weapon—Allen's sawed off-shogun—ever located. The jury was instructed on the offense of first-degree murder and the lesser included offenses of second-degree murder and voluntary manslaughter. During closing argument, the State emphasized Smith's testimony that Allen had thrown rocks at Gailey's body while they waited for hours for Gailey to die in seeking to persuade the jury to convict on a theory of malice, premeditation, and deliberation. Eschewing Smith's initial theory that Allen murdered Gailey for his money, the State argued in closing that Allen killed Gailey "to keep him from ratting [Allen] out . . . [and] to keep [Allen] from being arrested for his year-long rampage." The jury found Allen guilty of first-degree murder.

¶ 16  During the sentencing phase, the State submitted three aggravating

circumstances to the jury: (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest; (2) the murder was committed for pecuniary gain; and (3) the murder was especially heinous, atrocious, or cruel. Allen's trial counsel submitted one statutory mitigating circumstance and fourteen non-statutory mitigating circumstances. The jury determined the State had proven all three aggravating circumstances beyond a reasonable doubt. Allen established only two non-statutory mitigating circumstances—that he had been deeply affected by the death of his grandfather and that Allen's death would have a detrimental impact on his family. The jury found the mitigating circumstances insufficient to outweigh the aggravating circumstances and that the aggravating circumstances, when considered with the mitigating circumstances, were sufficiently substantial to call for the imposition of the death penalty. Allen was sentenced to death.

## B. Allen's MAR and SMAR claims.

Allen filed his initial MAR on 2 July 2007. In his MAR, Allen asserted the following ten claims:

- Claim I: The State knowingly presented false and misleading evidence at trial in violation of Allen's rights under the Fourteenth Amendment to the Constitution of the United States.

- Claim II: Allen's trial counsel provided IAC during the guilt-innocence phase by failing to investigate and call defense witnesses who could have provided

exculpatory evidence.

- Claim III: Allen's trial counsel provided IAC during the guilt-innocence phase by failing to effectively cross-examine the State's witnesses.

- Claim IV: The State failed to produce exculpatory material before trial in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

- Claim V: The trial court lacked jurisdiction to try, convict, and sentence Allen because the State's indictment for first-degree murder was fatally deficient.

- Claim VI: Allen's trial counsel rendered IAC during both the guilt-innocence and the sentencing phases of his trial by failing to object to the State's improper statements during closing arguments.

- Claim VII: Allen's trial counsel rendered IAC during the sentencing phase by failing to present testimony from a mental health expert.

- Claim VIII: Allen's trial counsel rendered IAC during the sentencing phase by failing to investigate and present available mitigation evidence.

- Claim IX: Allen's trial counsel rendered IAC during the sentencing phase by failing to adequately prepare Allen's witnesses to testify.

- Claim X: Allen's trial counsel rendered IAC based upon the cumulative effect of his counsel's various errors during both the guilt-innocence and sentencing phases of his trial.

In support of his MAR, Allen submitted statements and affidavits from individuals

who interacted with Allen, Gailey, and Smith before and after Gailey's death, as well as from Allen's friends and family members. Allen also submitted affidavits from two mental health experts, Dr. John F. Warren III, a forensic psychologist, and Dr. Kristine M. Herfkens, a neuropsychologist.

¶ 18 On 19 September 2013, Allen filed his SMAR. In his SMAR, Allen supplemented and amended various claims he initially raised in his MAR based upon new affidavits and statements elicited during additional post-conviction investigation. Allen again submitted affidavits from acquaintances of Smith's who cast doubt on her version of events—including an affidavit from Smith's former boyfriend stating that Smith told him she had been the one who developed and carried out the plan to jump Gailey and take his cocaine and cash. Of particular note, Allen submitted an affidavit and report prepared by Gregory McCrary (the McCrary Report), a former agent with the Federal Bureau of Investigation, who examined the evidence law enforcement found at the crime scene and determined it was inconsistent with Smith's account of an unprovoked execution. Instead, McCrary concluded the evidence reflected a physical confrontation which had devolved into a shootout between Allen and Gailey.

¶ 19 Allen's SMAR also contained two new claims:

- Claim XI: Allen's trial counsel rendered IAC during the guilt-innocence phase by failing to investigate evidence implicating a third party in Gailey's

murder.

- Claim XII: Allen was impermissibly shackled in the presence of the jury without the trial court conducting a hearing or entering findings of fact as to the need for restraints.

Allen sought a new trial and sentencing hearing or, in the alternative, an evidentiary hearing on his MAR and SMAR claims.

¶ 20 In response, the State answered and moved for summary dismissal of all claims. On 17 May 2016, the MAR court sent the parties a Memorandum of Ruling asking the parties to draft proposed orders disposing of Allen's MAR and SMAR claims. Ultimately, the MAR court issued three separate orders.

¶ 21 The first order—the "Order Summarily Dismissing Certain Claims of Defendant's Motion for Appropriate Relief and Supplemental Motion for Appropriate Relief"—summarily dismissed Claims I, II, IV, V, VI, X, XI, and XII in their entirety and certain subparts of Claim III.[2] The second order concerned the trial court's decision to deny Allen access to some of Smith's sealed mental health and substance abuse treatment records during trial. In this order, the MAR court provided for a "limited evidentiary hearing" to determine if Allen had presented sufficient evidence of prejudice to warrant a full evidentiary hearing. After conducting this limited

---

[2] The MAR court and the parties use numbers and Roman numerals interchangeably throughout the proceedings below. For consistency, we use Roman numerals when referring to Allen's claims throughout this opinion.

evidentiary hearing, the MAR court dismissed these sub-claims in its "Order Granting State's Motion to Dismiss Claims 3H, 3J, 3K and a Portion of 3I of Defendant's Supplemental Motion for Appropriate Relief." The third order—the "Order on State's Summary Denial Motion on Claims VII, VIII, and IX"—granted Allen an evidentiary hearing on his claims alleging IAC during the sentencing phase of his trial. After completing this full evidentiary hearing, the MAR court dismissed these claims in its "Order Granting State's Motion to Dismiss Claims [VII], [VIII], and [IX] of Defendant's Motion for Appropriate Relief and Supplemental Motion for Appropriate Relief."

¶ 22          On appeal, Allen challenges the MAR court's disposition of every claim raised in his MAR and SMAR. On the claims the MAR court summarily denied or denied after the limited evidentiary hearing—Claims I, II, III, IV, V, VI, X, XI, and XII—Allen asks us to vacate the orders dismissing those claims and remand for a full evidentiary hearing. On the claims the MAR court denied after a full evidentiary hearing—Claims VII, VIII, and IX—Allen seeks a reversal of the order dismissing those claims and a remand for a new sentencing proceeding. The State opposes and asks this Court to affirm the MAR court's orders dismissing all claims. We hold that the MAR court erred in summarily dismissing Allen's guilt-innocence phase IAC claims, as well as his impermissible shackling claim. We affirm the portions of the MAR court's orders dismissing all other claims.

## II.    Analysis

¶ 23    Our examination of the MAR court's disposition of Allen's MAR and SMAR claims necessarily begins with the statutes governing post-conviction review. Under N.C.G.S. § 15A-1420, a capital defendant who files an MAR within the appropriate time period "is entitled to a hearing on questions of law or fact arising from the motion and any supporting or opposing information presented unless the court determines that the motion is without merit." N.C.G.S. § 15A-1420(c)(1) (2019). When a capital defendant has properly filed an MAR, the trial court "must determine, on the basis of these materials and the requirements of this subsection, whether an evidentiary hearing is required to resolve questions of fact." *Id.* If the defendant's MAR and supporting materials create disputed issues of fact, then the MAR court is obligated to conduct an evidentiary hearing to resolve any disputed facts unless "the trial court can determine that the defendant is entitled to no relief even upon the facts as asserted by him." *McHone*, 348 N.C. at 257.[3] By contrast, when a defendant's MAR

---

[3] When a non-capital defendant files an MAR pursuant to N.C.G.S. § 15A-1414(a)(1), which must be filed within ten days after entry of judgment, the trial court is not required to conduct an evidentiary hearing. Instead, as provided under N.C.G.S. § 15A-1420(c)(2), "[a]n evidentiary hearing is not required *when the motion is made in the trial court pursuant to [N.C.G.S. §] 15A-1414*, but the court *may* hold an evidentiary hearing if it is appropriate to resolve questions of fact." N.C.G.S. § 15A-1420(c)(2) (2019) (emphases added). Because Allen is a capital defendant who did not file his MAR pursuant to N.C.G.S. § 15A-1414, the trial court lacks discretion to refuse to conduct an evidentiary hearing if his MAR and supporting materials created disputed factual issues which, if resolved in his favor, would entitle him to relief.

"presents only questions of law, including questions of constitutional law, the trial court *must* determine the motion without an evidentiary hearing." *Id.*

Thus, our analysis of Allen's challenge to the MAR court's summary dismissal of certain claims differs from our analysis of Allen's challenge to the MAR court's dismissal of other claims after conducting an evidentiary hearing. We review the MAR court's summary dismissal de novo to determine whether the evidence contained in the record and presented in Allen's MAR—considered in the light most favorable to Allen—would, if ultimately proven true, entitle him to relief. *McHone*, 348 N.C. at 258 ("Under subsection (c)(4), read in pari materia with subsection (c)(1), (c)(2), and (c)(3), an evidentiary hearing is required unless the motion presents assertions of fact which will entitle the defendant to no relief *even if resolved in his favor*.") (emphasis added); *see also State v. Jackson*, 220 N.C. App. 1, 6 (2012) ("[T]he ultimate question that must be addressed in determining whether [an MAR] should be summarily denied is whether the information contained in the record and presented in the defendant's [MAR] would suffice, if believed, to support an award of relief.").[4] If answering this question requires resolution of any factual disputes,

---

[4] To be clear, the MAR court only views the evidence presented in a defendant's MAR in the light most favorable to the defendant when making the initial determination as to whether the facts alleged by the defendant would entitle the defendant to relief if proven true. Nothing in this opinion alters the undisputed premise that the defendant ultimately bears the burden of proving by a preponderance of the evidence "the existence of the asserted ground for relief." N.C.G.S. § 15A-1420(c)(6).

N.C.G.S. § 15A-1420(c)(1) requires us to vacate the summary dismissal order and remand to the MAR court to conduct an evidentiary hearing. *McHone*, 348 N.C. at 259 ("This Court is not the appropriate forum for resolving issues of fact . . . ."). [5] At this stage, the MAR court is entitled to summarily dismiss claims that are irrelevant (e.g., claims that even if proven true, would not entitle the defendant to relief) and claims that are without any apparent evidentiary basis (e.g., unsupported assertions). When the factual allegations would entitle the defendant to relief if true, and the defendant's filings provide some evidentiary basis for the allegations, then the MAR court must conduct an evidentiary hearing to determine the facts necessary to resolve the claim on its merits. However, if the MAR court has already conducted an evidentiary hearing, our role is "to determine . . . whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *State v. Matthews*, 358 N.C. 102, 105–06 (2004) (quoting *State v. Stevens*, 305 N.C. 712, 720 (1982)). The MAR court's factual findings are "binding upon the [defendant] if they [a]re supported by evidence," even if the

---

[5] The dissent erroneously states that "this Court did not remand *McHone* for an evidentiary hearing." *But see McHone,* 348 N.C. at 258–60 ("[D]efendant also contends in the present case that he was entitled to an evidentiary hearing before the trial court ruled on his motion for appropriate relief as supplemented because some of his asserted grounds for relief required the trial court to resolve questions of fact. We find this contention to have merit. . . . The trial court erred in denying defendant's supplemental motion without an evidentiary hearing. . . . [W]e reverse the trial court's order denying defendant's motion for appropriate relief and remand this case to that court for further proceedings."). Moreover, *McHone* is not the only authority for the disposition in this case. The MAR statute itself makes it clear that an evidentiary hearing is required in these circumstances.

evidence is "conflicting," *Stevens*, 305 N.C. at 719–20, but the MAR court's conclusions of law are always reviewed de novo, *State v. McNeill*, 371 N.C. 198, 220 (2018).

¶ 25    We proceed by applying this legal framework to Allen's claims as follows: First, we review the portions of the MAR court's order summarily dismissing Allen's claims alleging he received IAC during the guilt-innocence phase of his trial. Second, we review the other claims addressed in the summary dismissal order which do not directly allege IAC. Third, we review the order dismissing certain subparts of Claim III relating to the trial court's refusal to grant Allen access to Smith's treatment records entered after the MAR court conducted a "limited evidentiary hearing." Finally, we review the order dismissing Allen's claims alleging IAC during the sentencing phase of his trial entered after the MAR court conducted a full evidentiary hearing.

## A.  Ineffective assistance of counsel during the guilt-innocence phase.

¶ 26    Allen's argument that his attorneys rendered IAC during the guilt-innocence phase of his trial encompasses multiple interrelated claims. Because these claims substantially overlap both factually and legally—and because the MAR court disposed of these claims in a single summary dismissal order—we consider them together. Specifically, in this section, we consider in their entirety Claim II (trial counsel's failure to investigate and call certain witnesses), Claim VI (trial counsel's failure to object to improper statements during closing arguments), Claim X

(cumulative prejudice arising out of trial counsel's multiple instances of deficient performance), and Claim XI (trial counsel's failure to investigate evidence of a third party's guilt). We also consider the subparts of Claim III (trial counsel's failure to effectively cross-examine the State's witnesses) which the MAR court resolved without conducting an evidentiary hearing. Although addressed in the same order, we separately address the claims which do not predominantly concern Allen's IAC allegations, namely Claim I (the State knowingly presented false and misleading evidence), Claim IV (the State failed to disclose exculpatory evidence before trial), Claim V (the trial court lacked jurisdiction because Allen's indictment was fatally deficient), and Claim XII (Allen was impermissibly shackled in view of the jury).

This Court has "expressly adopt[ed]" the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), as the "uniform standard to be applied to measure ineffective assistance of counsel under the North Carolina Constitution" and the Sixth Amendment to the Constitution of the United States. *State v. Braswell*, 312 N.C. 553, 562–63 (1985). Under the first prong of the *Strickland* test, a defendant must "establish that counsel's performance was deficient." *State v. Todd*, 369 N.C. 707, 710 (2017). To prove deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Under the second prong of the *Strickland* test, the "defendant must demonstrate that the deficient performance prejudiced [his]

defense." *Todd*, 369 N.C. at 710–11. To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 28        We begin by examining Allen's assertion that his trial counsel unreasonably failed to investigate the crime scene evidence, which is contained within Claim III as supplemented and amended in his SMAR. This portion of Claim III is substantially based upon the evidence contained in the McCrary Report. McCrary was retained by Allen's post-conviction counsel to independently assess the evidence discovered by law enforcement at the scene of Gailey's death. Based upon his analysis of the crime scene evidence, McCrary concluded that portions of Smith's testimony were incompatible with the physical evidence and, in his judgment, "unfathomable." According to McCrary, the crime scene evidence "refute[s] Ms. Smith's assertion that Mr. Gailey was assassinated in cold blood, never having got his gun out." Instead, in McCrary's opinion, "the totality of the evidence at the [crime] scene is more consistent with a dispute that deteriorated into a gunfight and significantly contradicts and discredits Ms. Smith's story."

¶ 29        Allen alleges his trial counsel were deficient for failing to obtain information regarding the inconsistencies between Smith's testimony and the crime scene

evidence prior to trial. In Allen's view, counsel's failure to adequately investigate the crime scene prejudiced his case in at least two ways. First, it deprived him of the opportunity to choose to present testimony based upon the crime scene evidence which would have directly rebutted Smith's account of Gailey's death. Second, it deprived his counsel of the capacity to effectively cross-examine Smith on the discrepancies between her account and the physical evidence. The MAR court did not conduct an evidentiary hearing on this claim, and Allen seeks only a remand for an evidentiary hearing. Therefore, the question at this stage is not whether Allen has proven that he received IAC. Instead, the question is whether he has stated facts which, if proven true, would entitle him to relief. We conclude that he has.

¶ 30        An attorney can render IAC by failing to conduct an adequate investigation of the physical evidence of a crime. *See, e.g.*, *Elmore v. Ozmint*, 661 F.3d 783, 864 (4th Cir. 2011) ("Because [the defendant] lawyers' investigation into the State's forensic evidence never started, there could be no reasonable strategic decision either to stop the investigation or to forgo use of the evidence that the investigation would have uncovered."). Here, Allen has presented evidence which could support factual findings which could, in turn, establish a successful IAC claim. He has presented evidence supporting his contentions that (1) counsel were aware of the importance of the crime scene evidence before trial but unreasonably failed to follow up on these "red flags," *Rompilla v. Beard*, 545 U.S. 374, 392 (2005); (2) counsel did not perform an

independent investigation of the crime scene evidence; (3) counsel's conduct was unreasonable when judged against prevailing professional norms in capital cases, including those outlined in the American Bar Association's guidelines; and (4) counsel's unreasonable failure to investigate was prejudicial. Given the centrality of Smith's testimony to the State's case, if each of these factual contentions were proven to be true, Allen would be entitled to a new trial. *See, e.g.*, *Elmore,* 661 F.3d at 870 ("Though perhaps the jury would have yet believed the [State's witnesses], there is a reasonable probability that the jury would have doubted the [witnesses'] account" had defense counsel presented contradictory forensic evidence); *Rompilla*, 545 U.S. at 376 ("The undiscovered . . . evidence, taken as a whole, might well have influenced the jury's appraisal of [the defendant's] culpability, and the likelihood of a different result had the evidence gone in is sufficient to undermine confidence in the outcome actually reached . . . ." (cleaned up) (first quoting *Wiggins v. Smith*, 539 U.S. 510, 538 (2003); then quoting *Strickland*, 466 U.S. at 694)). Thus, the MAR court erred in summarily dismissing Allen's guilt-innocence IAC claims.

¶ 31 The MAR court's reasoning in support of its decision to summarily dismiss these claims is critically flawed. According to the MAR court, Allen's counsel's failure to consult with or present testimony from a crime scene expert resulted from a "sound tactical decision." This "sound tactical decision" purportedly reflected the reasonable trial strategy of "focus[ing] on the doubt created by Smith's gaps in memory, addiction

and use of controlled substances on the date of Gailey's death, and failure to maintain a cohesive timeline, rather than attempting to prove Defendant's innocence through the use of a crime scene analyst."

¶ 32    It is correct that in considering an IAC claim, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. However, this presumption is rebuttable. Once a defendant presents evidence rebutting the presumption of reasonableness, the court is not at liberty to invent for counsel a strategic justification which counsel does not offer and which the record does not disclose. *See Wiggins*, 539 U.S. at 526–27 (rejecting "strategic" reasons that "the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence [as] resembl[ing] more [of] a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing").

¶ 33    In this case, Allen has presented direct evidence indicating his trial counsel's decision not to adequately investigate the crime scene—and their resulting decision not to present evidence derived from an adequate investigation or use such evidence to impeach Smith's testimony—was not a reasonable strategic choice. His SMAR included an affidavit from one of his two trial attorneys explicitly stating that he "do[es] not recall [either himself or Allen's other attorney] making any strategic decisions to limit the cross-examination of the State's witnesses, including Vanessa

Smith." This directly undercuts the MAR court's presently unsupported theory that counsel's failure to investigate resulted from a "tactical decision" to focus on Smith's lack of credibility due to her drug use.[6] If it is true that trial counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment," then counsel's performance was deficient. *Wiggins*, 539 U.S. at 526.

¶ 34        Even if trial counsel chose to pursue a "strategy" of focusing on Smith's lack of credibility, counsel's failure to adequately investigate the crime scene could still be unreasonable. *Strickland*, 466 U.S. at 690–91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."). With the benefit of insights gleaned from the crime scene, counsel could have directly contradicted Smith's account of Gailey's death with tangible, extrinsic evidence, a tactic which would only serve a strategy centered around attacking Smith's credibility. To answer the question of whether Allen's counsel made a reasonable strategic judgment in foregoing a thorough investigation of the crime scene, the MAR court needed to

---

[6] The dissent advances the curious and novel position that because Allen's trial counsel had represented other capital defendants without rendering IAC and had not been disciplined by the State Bar, Allen could not have received IAC at his trial or sentencing proceeding. The dissent cites no relevant authority for that proposition. The State never made this argument and we reject this contention. Obviously, the adequacy of an attorney's representation in one trial does not establish the adequacy of an attorney's representation in a different trial, nor does the IAC claim require that an attorney have been disciplined by the State Bar in order to demonstrate ineffective assistance. *See, e.g.*, *Strickland*, 466 U.S. at 687 (explaining that to prove IAC, a defendant must "show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense").

resolve factual issues, a task our statutes do not permit it to undertake in these circumstances without first conducting an evidentiary hearing.

¶ 35          Alternatively, the MAR court rested its conclusion that Allen's counsel was not deficient on the following brief statement Allen made during a colloquy with the trial court regarding his rights as a criminal defendant:

> THE COURT: Knowing that you have the right to present evidence and you have the right not to, what is your desire about presenting evidence in this case?
>
> MR. ALLEN: Well, I don't know anything. I don't know what happened, so I have nothing to contribute to it.

According to the MAR court, this statement proves that "defense counsel['s] decision not to call any witnesses [during] the guilt[-innocence] phase of Defendant's trial was a tactical decision that was made after consultation with Defendant." Even if this perfunctory exchange could possibly support the conclusion that counsel's choices were strategic, it does not necessarily disprove Allen's contention that counsel's "tactical decision" was unreasonable, nor his argument that counsel could not reasonably make such an important "tactical decision" without first conducting an adequate investigation of the crime scene evidence.

¶ 36          The State's arguments in support of the MAR court's order are also unpersuasive. The State appears to argue that even if Allen's counsel were deficient, Allen could not have been prejudiced because the crime scene evidence in no way detracted from the State's overwhelming evidence of guilt. To begin with, Allen need

not present evidence which, if believed, would entirely exculpate him of all criminal conduct relating to Gailey's killing. Allen was convicted of first-degree murder, which made him eligible to receive the death penalty. Yet the trial court also instructed on lesser included offenses for which he would not have been eligible to receive the death even if he were convicted. If counsel's conduct resulted in Allen being convicted of first-degree murder rather than second-degree murder or voluntary manslaughter, then Allen was prejudiced.

¶ 37     Regardless, the State's argument that Allen cannot prove prejudice rests on two erroneous premises. First, the State contends the McCrary Report cannot support Allen's IAC claim because it failed to account for the State's evidence indicating Allen shot Gailey "in the back at close range with a shotgun." This assertion is belied by the text of the McCrary Report, which explicitly acknowledges the State's medical examiner's conclusion that Gailey was shot from "quite close, within a matter of a foot or so" and also from "several yards away." McCrary's conclusion that "the totality of the evidence at the [crime] scene is more consistent with a dispute that deteriorated into a gunfight" reflects his interpretation of *all* of the crime scene evidence, including the evidence the State relied upon in support of Allen's conviction.

¶ 38     Second, the State argues that because there was evidence indicating Allen shot Gailey "in the back at close range with a shotgun," no rational juror could possibly conclude that Allen committed anything other than first-degree murder. As the State

bluntly puts it, "[s]hooting someone in the back at close range with a shotgun is not a gunfight, it is premeditated and deliberated murder." This argument incorrectly suggests that Allen's intent has been established as a matter of law by the manner of Gailey's death. The State disregards more than a century of precedent explaining that "[w]hether an act is the result of premeditation and deliberation is a fact to be found by the jury, and not a conclusion of law to be drawn by the court." *State v. Daniels*, 134 N.C. 671, 674 (1904).

¶ 39     While the jury could have inferred that Allen acted with premeditation and deliberation based upon "the distance from which the shot was fired and . . . the weapon and ammunition used," *State v. Reece,* 54 N.C. App. 400, 406 (1981), these facts would not have precluded Allen from persuading the jury to draw a different inference, *see State v. Walker*, 332 N.C. 520, 533 (1992) (concluding that the "nature of the killing, a contact shot to the temple, *indicates* a premeditated and deliberate act of homicide . . . [which] *support*[s] *a reasonable inference*" of intent (emphases added)). The nature of Gailey's wounds is not necessarily inconsistent with the alternative theory propounded by McCrary of a drug-fueled confrontation that turned fatal, a theory Allen alleges is supported by physical evidence from the crime scene,

such as the evidence demonstrating Gailey fired his weapon and the unexplained presence of a hunting knife.[7]

¶ 40        As described above, in addition to his argument based upon counsel's purported failure to adequately investigate the crime scene evidence, Allen raises other related IAC claims challenging other aspects of his trial counsel's performance during the guilt-innocence phase of his trial. Having already determined that the MAR court erred in summarily denying one of Allen's IAC claims, we need not address his other claims here without the benefit of a more fully developed factual record. Applying the two-prong *Strickland* test, we conclude that Allen has presented evidence supporting his contention that his attorneys provided IAC during the guilt-innocence phase of his trial, creating factual disputes which, if resolved in his favor, would entitle him to relief. At a minimum, he is entitled to further develop these claims during an evidentiary hearing. *Todd*, 369 N.C. at 712 (remanding for an evidentiary hearing because "the record before th[e] Court [was] not thoroughly developed regarding defendant's appellate counsel's reasonableness, or lack thereof, in choosing not" to pursue an argument).

---

[7] Further, if the evidence could only support the conclusion Allen had committed first-degree murder, the trial court would have had no reason to instruct on the lesser included offenses of second-degree murder and voluntary manslaughter, neither of which requires the State to prove the killing was committed with premeditation and deliberation.

¶ 41        Accordingly, we vacate the relevant portions of the MAR court's order summarily dismissing Allen's guilt-innocence IAC claims. Because "an evidentiary hearing *is required unless* the motion presents assertions of fact which will entitle the defendant to no relief even if resolved in his favor, or the motion presents only questions of law, or the motion is made pursuant to N.C.G.S. § 15A-1414," *McHone*, 348 N.C. at 258 (emphasis added), we remand to the MAR court to conduct an evidentiary hearing. At the evidentiary hearing, the MAR court will determine whether Allen's counsel were deficient and, if so, whether counsel's deficient performance was prejudicial.

¶ 42        If the MAR court reaches the question of prejudice, the MAR court must examine whether any instances of deficient performance at discrete moments in the trial prejudiced Allen when considered both individually and cumulatively. We reject the MAR court's erroneous conclusion that cumulative prejudice is unavailable to a defendant asserting multiple IAC claims. We have previously acknowledged cumulative prejudice IAC claims, *see, e.g., State v. Thompson*, 359 N.C. 77, 121–22 (2004) (recognizing cumulative prejudice argument but dismissing IAC claim on other grounds), as has the United States Supreme Court in *Williams v. Taylor*, 529 U.S. 362, 396–98 (2000). Therefore, we adopt the reasoning of the unanimous Court of Appeals panel which recently concluded that "because [IAC] claims focus on the reasonableness of counsel's performance, courts can consider the cumulative effect of

alleged errors by counsel." *State v. Lane*, 271 N.C. App. 307, 316, *review dismissed*, 376 N.C. 540 (2020), *review denied*, 851 S.E.2d 624 (N.C. 2020). [8] To be clear, only instances of counsel's deficient performance may be aggregated to prove cumulative prejudice—the cumulative prejudice doctrine is not an invitation to reweigh all of the choices counsel made throughout the course of representing a defendant.

¶ 43     We next address the portions of the "Order Summarily Dismissing Certain Claims of Defendant's Motion for Appropriate Relief and Supplemental Motion for Appropriate Relief" disposing of Claims I, IV, V, and XII.

### 1. *Knowing presentation of false and misleading evidence.*

¶ 44     In Claim I of his MAR and SMAR, Allen alleges that the State violated his constitutional rights by allowing Smith to testify in a manner the State knew to be

---

[8] Our decision to recognize cumulative prejudice claims is based upon our own interpretation of *Strickland* and IAC doctrine, and is in accord with numerous federal and state appellate decisions (including the recent decision by our Court of Appeals), none binding on this Court, but which we find persuasive. *See, e.g.*, *Williams v. Washington*, 59 F.3d 673, 681 (7th Cir. 1995) ("In making this showing [of prejudice], a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet *Strickland's* test."); *Rodriguez v. Hoke*, 928 F.2d 534, 538 (2d Cir. 1991) ("Since [the defendant's] claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together."); *Ewing v. Williams*, 596 F.2d 391, 395 (9th Cir. 1979) ("[E]ven where, as here, several specific errors are found, it is the duty of the Court to make a finding as to prejudice, although this finding may either be 'cumulative' or focus on one discrete blunder in itself prejudicial."); *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012) ("[W]e [ ] look to the cumulative effect of counsel's errors to determine whether the defendant satisfied the prejudice prong of the *Strickland* test."); *State v. Thiel*, 2003 WI 111, ¶ 4, 264 Wis. 2d 571, 581, 665 N.W.2d 305, 311 ("We conclude that counsel's performance was deficient in several respects and that the cumulative effect of the deficiencies prejudiced [the defendant's] defense to an extent that it undermines our confidence in the outcome of the trial.").

false and misleading. In support of his claim, Allen relies principally on post-conviction affidavits from individuals whose account of events surrounding Gailey's death differ from and conflict with Smith's recollection. The MAR court determined this claim was procedurally barred pursuant to N.C.G.S. § 15A-1419(a)(3), which provides in relevant part that it is "grounds for the denial of a motion for appropriate relief, including motions filed in capital cases . . . [if u]pon a previous appeal the defendant was in a position to adequately raise the ground or issue underlying the present motion but did not do so." In the alternative, the MAR court concluded this claim was meritless.

¶ 45 On direct appeal, Allen alleged that the State presented two portions of Smith's testimony which it knew to be false and misleading. *Allen*, 360 N.C. at 305. He argued that the State knew Smith's account of waiting hours for Gailey to die and hearing Gailey "empty his gun out" as she left the Uwharrie National Forest was false and misleading in light of the medical examiner's testimony that Gailey could not have survived more than a brief time after being shot. *Id.* We rejected this claim, noting the "difference between the knowing presentation of false testimony and knowing that testimony conflicts in some manner." *Id.*

¶ 46 Assuming without deciding that Claim I is not procedurally barred—and even if the facts alleged in his supporting affidavits were proven to be true—the same distinction we recognized on direct appeal controls our disposition of Allen's MAR

claim. We must again conclude that "nothing in the record tends to show the [State] knew [Smith's] testimony was false." *Id.* at 306. Thus, Allen cannot meet his burden of proving that the State "knowingly and intentionally used" false and misleading testimony "to obtain his conviction." *State v. Williams*, 341 N.C. 1, 16 (1995). Accordingly, we affirm the portion of the MAR court's order summarily dismissing Claim I.

### 2. *Failure to produce exculpatory material before trial in violation of* **Brady v. Maryland.**

In Claim IV of his MAR, Allen alleges that the State violated his constitutional rights as established in *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a successful *Brady* claim, a defendant must prove that the State withheld evidence which would have been "favorable" to the defendant, either as impeachment evidence or exculpatory evidence, and that the evidence was "material," meaning "there is a 'reasonable probability' of a different result had the evidence been disclosed." *State v. Williams*, 362 N.C. 628, 636 (2008) (quoting *State v. Berry*, 356 N.C. 490, 517 (2002)).

> A defendant's burden . . . is more than showing that withheld evidence might have affected the verdict, but less than showing that withheld evidence more likely than not affected the verdict. When we consider whether there was a reasonable probability that the undisclosed evidence would have altered the jury's verdict, we consider the context of the entire record.

*State v. Best*, 376 N.C. 340, 349 (2020) (cleaned up) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)), *petition for cert. filed*, No. 20-1608 (U.S. May 18, 2021).

¶ 48        The basis for Allen's *Brady* claim was that the State provided an incomplete account of Page's criminal record prior to putting him on the stand to testify. Although the State did convey information regarding other of Page's prior criminal convictions, the State failed to disclose Page's two prior criminal convictions for misdemeanor injury to personal property.

¶ 49        We are persuaded that Allen cannot prove these omitted prior convictions were "material" within the meaning of *Brady*. When Page testified, the jury was made aware of the fact that Page had previously been convicted of other, more serious crimes, that he had been charged as an accessory after the fact to Gailey's murder, and that he had initially made false statements to law enforcement regarding his interactions with Allen. Informing the jury that Page had also committed two other minor crimes could not have meaningfully altered the jury's perception of Page's credibility as a witness. Under these circumstances, where the withheld information is substantially similar to information properly disclosed to counsel and presented to the jury, we conclude that Allen cannot "show[ ] that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

### 3. *The trial court's jurisdiction to try, convict, and sentence Allen.*

¶ 50        In Claim V of his MAR, Allen alleges that his short-form indictment was constitutionally improper for failing to fully state the elements of first-degree murder

and the aggravating circumstances to be submitted to the jury. Allen raised this exact claim on direct appeal, which we denied, explaining that this Court has "consistently ruled short-form indictments for first-degree murder are permissible under . . . the North Carolina and United States Constitutions." *Allen*, 360 N.C. at 316. Since Allen's direct appeal, there has been no retroactively effective change in the applicable law. Accordingly, we affirm the portion of the MAR court's order summarily dismissing this claim on the ground that it is procedurally barred pursuant to N.C.G.S. § 15A-1419(a)(2).

### 4. *Impermissible shackling in view of the jury.*

¶ 51     In Claim XII of his SMAR, Allen alleged that he was impermissibly shackled in view of the jury without justification, in violation of his constitutional rights. In support of his claim, Allen produced an affidavit from one juror stating that she "know[s] that . . . Allen had some type of shackles or restraints on during the trial" and an affidavit from an alternate juror stating that he "noticed . . . Allen's appearance and demeanor in the courtroom . . . [and] saw that he had tattoos on his body and that he was wearing leg irons." In addition, Allen's post-conviction counsel disclosed to the MAR court that a different juror "told post-conviction investigators that [Allen] was shackled and 'there were deputies all around him' " but refused to sign an affidavit. The State argued, and the MAR court agreed, that Allen's claim was procedurally barred under N.C.G.S. § 15A-1419(a)(3). In the alternative, the MAR

court concluded that even if Allen's shackling claim was not procedurally barred, it was meritless.

¶ 52     Under both the North Carolina Constitution and the Constitution of the United States, a defendant may not be visibly shackled in the courtroom in the presence of the jury unless there is a special need for restraints specific to the defendant. *See State v. Tolley*, 290 N.C. 349, 367–68 (1976); *see also Deck v. Missouri*, 544 U.S. 622, 626 (2005) ("The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need."). Mirroring this constitutional rule, North Carolina law permits a trial court to order a defendant restrained in the courtroom only when doing so is "reasonably necessary to maintain order, prevent the defendant's escape, or provide for the safety of persons," and only after the trial court "[e]nter[s] in the record out of the presence of the jury and in the presence of the person to be restrained and his counsel, if any, the reasons for" imposing the restraints. N.C.G.S. § 15A-1031 (2019). The defendant must also be afforded an opportunity to be heard on the matter, and the trial court must instruct the jurors "that the restraint is not to be considered in weighing evidence or determining the issue of guilt." *Id.*; *see also Sigmon v. Stirling*, 956 F.3d 183, 202 (4th Cir. 2020) (noting the "longstanding" constitutional requirement "for the trial court to articulate a reason for [imposing] visible restraints on the record"). Typically, adherence to this mandatory statutory procedure ensures

that evidence of a defendant's shackling appears in the record and transcript of trial, enabling the defendant to challenge the trial court's decision to impose restraints on direct appeal.

¶ 53    In this case, however, there is no evidence in the record and transcript suggesting Allen was restrained at all during trial. The trial court did not enter factual findings as would have been required prior to ordering Allen shackled pursuant to N.C.G.S. § 15A-1031. The record and transcript do not reflect that Allen entered an objection or otherwise noted that he was restrained in a manner visible to the jury at any point during trial. The record and transcript reflect that Allen did not request and the trial court did not give a jury instruction that his appearance in restraints was not to be considered as evidence of his guilt.

¶ 54    Consistent with the logic of our decision in *State v. Hyman*, 371 N.C. 363 (2018), we conclude that the MAR court erred in summarily dismissing Allen's shackling claim as procedurally barred. We reject the State's invitation to construe N.C.G.S. § 15A-1419(a)(3) broadly as a general prohibition on post-conviction review of any claim not raised on direct appeal. Instead, we agree with Allen that a claim is not procedurally barred when the record on appeal is completely silent as to dispositive facts necessary to prove or disprove the claim. Because the record does not reveal the information necessary to determine whether Allen's claim is procedurally barred, the MAR court erred in summarily concluding that Allen was "in a position

to adequately raise the ground or issue underlying the [MAR claim]" on direct appeal within the meaning of N.C.G.S. § 15A-1419(a)(3).

¶ 55        In *Hyman*, we held that a defendant was not procedurally barred from raising an IAC claim on post-conviction review, even though he had not raised the claim on direct appeal. *Hyman*, 371 N.C. at 383. In that case, the defendant's IAC claim challenged his attorney's failure to withdraw from representing him during trial. *Id.* at 381. The attorney worked at a law firm that had previously represented a witness who was testifying at the defendant's trial and whose testimony inculpated the defendant. *Id.* at 367–68. During cross-examination, an exchange between counsel and the inculpating witness suggested that the witness had previously conveyed a different account of the events in question than the one the witness was offering at trial. *Id.* at 372. The defendant argued that his attorney should have withdrawn from the representation and testified regarding the content of this alleged prior conversation. *Id.* at 367.

¶ 56        In concluding that the *Hyman* defendant's claim was not procedurally barred, we explained that in order to prove that his attorney rendered IAC, the defendant was required to prove numerous facts, including that (1) the alleged pretrial conversation between the witness and the defendant's attorney had indeed occurred; (2) the witness made statements inconsistent with his trial testimony during said conversation; (3) the attorney did not have a strategic reason for failing to withdraw

from representing the defendant; and (4) the testimony the attorney would have been able to deliver would have benefitted the defendant. *Id.* at 384–85. We reasoned that because "[t]he record developed at trial did not contain any information *affirmatively tending to show*" any of those facts, the record did not "contain[ ] sufficient information to permit the reviewing court to make all the factual and legal determinations necessary to allow a proper resolution of the claim in question." *Id.* at 383–84 (emphasis added). We thus held that the procedural bar set forth in N.C.G.S. § 15A-1419(a)(3) did not apply. *Id.* at 385.

¶ 57     This reasoning requires us to hold that the MAR court erred in summarily concluding that Allen's shackling claim was procedurally barred. To assess Allen's shackling claim, three threshold facts must first be established. First, Allen must show that he was indeed shackled in the courtroom. Second, he must establish that the shackles were visible to the jury. Third, he must establish whether or not his trial counsel was aware that he was shackled in a way that was visible to the jury in the courtroom. Only when these facts have been established is it possible for a reviewing court to ascertain (1) whether or not the claim is procedurally barred, and (2) whether or not the trial court imposed restraints under circumstances which undermined the

fairness of the defendant's trial and the validity of its outcome.[9] *See State v. Holmes*, 355 N.C. 719, 729 (2002) (holding that where shackles are not visible to the jury, "the risk is negligible that the restraint undermined the dignity of the trial process or created prejudice in the minds of the jurors by suggesting that defendant is a dangerous person").

¶ 58 The record and transcript from Allen's trial are devoid of any information which would allow a court to resolve these central factual questions. If Allen had brought his claim on direct appeal, the only way a reviewing court could assess his claim would be by guessing or presuming answers. This is precisely the kind of circumstance in which further factual development is necessary to reach an informed judgment of a defendant's claim. As *Hyman* illustrates, given the affidavits Allen filed which indicate he may be able to prove the facts necessary to prevail on his claim, the proper course is to analyze Allen's shackling claim after an evidentiary hearing to determine the central facts at issue, rather than ruling without receiving the

---

[9] We do not have before us the question of whether counsel's failure to object to the imposition of visible restraints could form the basis of an IAC claim. *See, e.g.*, *Roche v. Davis*, 291 F.3d 473, 483 (7th Cir. 2002) (concluding that a capital defendant's counsel was deficient under *Strickland* because "not only did counsel fail to object to [the defendant's] shackling, he also failed to ensure that [the defendant's] shackles would not be visible to the jury while [the defendant] was sitting at counsel's table during the entire trial"); *Jackson v. Washington*, 270 Va. 269, 280 (2005) (concluding that "counsel's failure to object to [the defendant] being compelled to stand trial before the jury in jail clothes" rendered IAC). We leave it to the MAR court in the first instance to determine whether Allen should be permitted to again amend his MAR to include an allegation that he received IAC based upon a failure to object to his alleged shackling in view of the jury.

necessary facts.

¶ 59        The State argues that we should ignore the impossibility of resolving Allen's claim on the existing record because the insufficiency of the record purportedly results from Allen's own failure to supply at trial or on appeal the necessary information. Yet this presumes that either Allen or his trial counsel possessed all of the information required to perfect the record on appeal. Even though Allen and his counsel would have known whether Allen was shackled at trial, they may not have known whether his shackles were visible to the jury or whether, in the absence of a hearing on the matter, he was legally compelled to be shackled in the courtroom. More facts are needed to ascertain whether Allen was in an adequate position to raise this claim on direct appeal.

¶ 60        The State argues in the alternative that Allen is precluded from raising his shackling claim on post-conviction review because he failed to object to his purported shackling at trial. This argument misses the mark. Subsection 15A-1419(a)(3) contains no language restricting post-conviction review to claims that were preserved at trial. Indeed, claims preserved at trial can always be brought on direct appeal and the statute would, construed in this way, effectively prevent post-conviction review of all claims. The legislature did not include any language suggesting that a defendant's failure to object at trial triggers application of the procedural bar. We reject the State's invitation to read into the statute an extra-textual requirement the legislature

understandably did not see fit to include.

¶ 61     We have previously rejected and continue to disclaim any interpretation of N.C.G.S. § 15A-1419(a)(1)–(4) which imposes "a general rule that any claim not brought on direct appeal is forfeited on state collateral review." *State v. Fair*, 354 N.C. 131, 166 (2001) (quoting *McCarver v. Lee*, 221 F.3d 583, 589 (4th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001)). The rule is not that any claim not litigated on direct appeal cannot be brought in post-conviction proceedings. The rule is that such claims may be brought unless one or more of the procedural bars set forth in the relevant statutes applies and is not waived. On the present record, we are unable to conclude that Allen was "in a position to adequately raise the ground or issue underlying" his shackling claim on direct appeal but failed to do so. N.C.G.S. § 15A-1419(a)(3).

¶ 62     Having examined the facts and circumstances of Allen's shackling claim, we conclude that the trial court erred in summarily dismissing Allen's claim as procedurally barred because the record does not contain facts necessary to a fair resolution of the claim. Because Allen has presented sufficient evidence which would entitle him to an evidentiary hearing in the event that he can demonstrate his claim is not procedurally barred, we vacate the portion of the MAR court's order summarily dismissing Claim XII of his SMAR and remand to the trial court to conduct an evidentiary hearing to determine whether his shackling claim is procedurally barred and whether the claim has merit. *See McHone*, 348 N.C. at 258. At the hearing, as an

initial matter, Allen will have the burden of proving by a preponderance of the evidence (1) that he was shackled, (2) that he was shackled in the courtroom in the presence of, and in a manner visible to, the jury, and (3) whether his counsel knew he was impermissibly shackled in the courtroom and in the view of the jury.

**B. Claims regarding trial counsel's access to Smith's medical records.**

At trial, Allen's counsel sought access to records produced during Smith's stay at the Black Mountain Treatment Center in October 1993, as well as records from a period of involuntary commitment she experienced in Stanley County. The trial court granted the order but provided that when the documents were produced, the court would review them in camera to determine whether they should be disclosed to counsel. After conducting this review, the trial court released only the records of Smith's involuntary commitment. The trial court withheld all records obtained from the Black Mountain Treatment Center on the grounds that they contained no evidence indicating Smith suffered from any pertinent mental health conditions (e.g., conditions which would affect her credibility as a witness), nor any evidence indicating substance abuse issues distinct from what Smith herself had admitted to at trial.

In his SMAR, Allen supplemented Claim III of his original MAR to include additional subclaims relating to the trial court's refusal to disclose the Black

Mountain Treatment Center records.[10] While the precise nature and scope of the subclaims in Claim III vary, each is predicated on Allen's antecedent argument that the trial court violated his constitutional rights by failing to release the records to his counsel after conducting only an in camera review.[11]

¶ 65 After determining that Allen was not procedurally barred from pursuing these subclaims, the MAR court conducted a "limited evidentiary hearing to determine if Defendant suffered any sufficient prejudice to warrant a full evidentiary hearing on SMAR sub-claims 3H, 3J, 3K and that portion of sub-claim 3I that relates to the *in camera* examination of the sealed mental health and substance abuse records of State's trial witness Vanessa Smith." At this hearing, Allen presented testimony from Dr. Warren, one of his mental health experts. Dr. Warren testified that although Smith was not formally diagnosed with any pertinent mental health conditions at the Black Mountain Treatment Center, the records contained evidence that she suffered from borderline and antisocial personality disorders. He explained that he based his

---

[10] Although these allegations are contained within a broader claim alleging IAC during the guilt-innocence phase of trial, the MAR court conducted an evidentiary hearing solely on these subclaims.

[11] Subclaim 3H contends that defendant's trial counsel were rendered ineffective by the trial court's unconstitutional refusal to reveal the Black Mountain Treatment Center records; Subclaim 3J contends that the trial court impermissibly refused Allen the opportunity to conduct voir dire of Smith and Dr. Warren regarding the importance of the records prior to the trial court's determination not to release the records to Allen; Subclaim 3K contends that Allen should have been allowed to submit extrinsic evidence of Smith's unreliability contained in the records; and the relevant portion of Subclaim 3I contends that Allen's counsel were ineffective because they cross-examined Smith without knowledge of the information contained in the records.

conclusion on the varying and conflicting statements Smith made to staff which were contained within the records, as well as the staff's description of Smith as "spiritually bankrupt," which he asserted was a term of art used by mental health professionals to refer to an individual who suffers from certain mental illnesses. The parties subsequently submitted post-hearing briefs. Ultimately, the MAR court entered an order containing numerous findings of fact in support of its conclusion of law that Allen "has failed to establish that he suffered any sufficient prejudice to warrant a full evidentiary hearing on [SMAR Subclaims 3H, 3J, 3K and the relevant portion of 3I]." The MAR court dismissed these subclaims.

¶ 66      There were two bases for the MAR court's conclusion that Allen could not have been prejudiced by the trial court's refusal to convey Smith's Black Mountain Treatment Center records. First, the MAR court found that the records were "bereft of any evidence to support an Axis II Personality B Complex Array diagnosis" and that Dr. Warren's attestations to the contrary were "wholly unpersuasive." Second, the MAR court found that Allen was permitted to "vigorously cross-examine Smith regarding her extensive abuse of several controlled substances, her abuse of alcohol, her early departure from a drug treatment facility, and several other topics meant to impugn her credibility."

¶ 67      We read the MAR court's findings of fact collectively as determining that (1) the Black Mountain Treatment Center records did not contain evidence indicating

Smith suffered from a pertinent mental health condition, and (2) the records did not contain evidence regarding Smith's substance abuse that meaningfully differed from the information Smith herself disclosed to the jury during her testimony. In the MAR court's view, because the records did not supply an alternative basis for impeaching Smith's credibility (evidence of a pertinent mental health condition)—and because the other information the records contained was largely duplicative of Smith's testimony (evidence of her substance abuse disorders)—Allen could not have been prejudiced by the trial court's failure to release the records.

¶ 68    We reiterate that when the MAR court has entered findings of fact in support of its conclusions of law, our review is limited to "determin[ing] whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *Stevens*, 305 N.C. at 720. Our inquiry does not change when, as in this case, the MAR court chooses to bifurcate its proceedings and first conducts a limited evidentiary hearing on a single potentially dispositive issue, as opposed to immediately conducting a full evidentiary hearing on all issues associated with a

claim.[12] Examining the MAR court's findings of fact, we conclude that they are supported by the evidence, that the findings support the MAR court's conclusions of law, and that the conclusions of law in turn justify the order dismissing these subclaims.

¶ 69    Although Dr. Warren asserted that the treatment records contained information tending to show Smith suffered from a pertinent mental health condition, the MAR court was entitled to disbelieve his testimony. The MAR court's contrary inference is supported by the contents of the records themselves, which do not contain any reference to or diagnosis of any pertinent mental health disorder, even though Smith was examined by multiple physicians. Similarly, although the records contained information illustrating the severity and persistence of Smith's substance abuse issues, the transcript of Smith's cross-examination at trial supports the trial court's finding that the jury was already aware of the extent of her history of chronic substance abuse issues and that the medical records would have merely been cumulative documentation of an uncontested fact. These findings support the

---

[12] Allen does argue that the MAR court erred by conducting a limited evidentiary hearing, instead of a full evidentiary hearing. However, Allen does not provide support for his contention that in conducting a limited hearing, the MAR court "deprived Allen of a full opportunity to support his factual allegations that he was entitled to a new trial." Nor does he identify how the limited evidentiary hearing—and the MAR court's subsequent request for post-hearing briefs and its allowance of the further offer of proof from Allen's post-conviction counsel regarding the records from another mental health expert, Dr. Herfkens—purportedly fell short of what is required under N.C.G.S. § 15A-1420(c)(1)–(4). Accordingly, we find no merit in his contention that the MAR court's handling of these subclaims violated his constitutional rights.

conclusion that Allen "has failed to establish that the trial court's withholding of the Black Mountain [Treatment Center] Records from his trial counsel and the State violated any of his constitutional rights or deprived Defendant of a fair trial." Accordingly, we affirm the Order Granting State's Motion to Dismiss Claims 3H, 3J, 3K, and a Portion of 3I of Defendant's Supplemental Motion for Appropriate Relief.

**C. Ineffective assistance of counsel during the sentencing phase.**

¶ 70    Allen raised three distinct IAC claims regarding the sentencing phase of his trial. First, in Claim VII, Allen argued that his trial counsel were ineffective for failing to elicit testimony from a mental health expert to explain the significance of lay witness testimony and other evidence presented to the jury at sentencing. Second, in Claim VIII, Allen argued that his trial counsel were ineffective for failing to adequately investigate and present available mitigation evidence, including by failing to meet with and present testimony from various friends, family members, and acquaintances of Allen. Third, in Claim IX, Allen argued that his trial counsel were ineffective for failing to adequately prepare witnesses to testify during the sentencing hearing. In dismissing each of these claims, the MAR court concluded as a matter of law that Allen's counsel were not deficient and that even if they were deficient, any deficient performance could not have been prejudicial.

¶ 71    The familiar two-part *Strickland* test also applies in examining Allen's sentencing-phase IAC claims. However, because the MAR court conducted an

evidentiary hearing, our review of these claims is again limited to "determin[ing] whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." *Matthews*, 358 N.C. at 105–06 (quoting *Stevens*, 305 at 720). Here, evidence in the record supports the MAR court's findings of fact on each claim. These findings in fact in turn support the conclusion of law that Allen did not receive IAC at sentencing.

¶ 72     Regarding Claim VII, we find dispositive the MAR court's finding of fact that in retaining two mental health experts who attempted to examine Allen and investigate his mental health by interviewing other sources, Allen's trial counsel

> made a reasonable investigation into Defendant's mental health and background, but Defendant's reluctance to complete psychological testing and refusal to fully comply with Dr. Warren's evaluation, coupled with the lack of evidence that Defendant suffered from a mental health disorder that would assist in his defense, led to [the experts] not being called as . . . mental health expert[s] at Defendant's capital sentencing proceeding. Under these circumstances, any decision trial counsel made not to call a mental health expert at Defendant's capital sentencing proceeding was reasonable.

A defendant's reluctance to cooperate with a mental health professional during sentencing does not absolve counsel of its duty to adequately investigate relevant mitigating circumstances. However, where the record contains no evidence tending to suggest the defendant suffers from a pertinent mental health condition and

defendant's counsel has retained a mental health expert who diligently attempted to elicit relevant information from both the defendant and the defendant's acquaintances, we cannot say that "no competent attorney" would fail to present evidence from the mental health expert at sentencing. *Premo v. Moore*, 562 U.S. 115, 124 (2011) (explaining that whether "no competent attorney would think a [foregone trial strategy] would have failed . . . is the relevant question under *Strickland*").

¶ 73    Regarding Claim VIII, we note the MAR court's finding that the additional witnesses Allen claims his counsel failed to present testimony from

> either (1) did not know Defendant very well, (2) had substantial character flaws that would have weakened Defendant's mitigation case, (3) would present only cumulative evidence, (4) did not present valid mitigating evidence, or (5) did not fit the mitigation strategy trial counsel chose to pursue at sentencing.

This finding is both supported by evidence in the record and is sufficient to sustain the conclusion that counsel's failure to call these witnesses could not have been prejudicial.

¶ 74    Finally, regarding Claim IX, the findings of fact support the conclusion of law that Allen cannot prove prejudice. We affirm the MAR court's conclusion that Allen failed to meet his "burden of proving by a preponderance of the evidence" that the "nature and extent of the testimony that" the testifying witnesses would have offered had they been better prepared for sentencing could reasonably have altered the outcome of his sentencing proceeding. *Hyman*, 371 N.C. at 386. Accordingly, we

affirm the order dismissing Allen's claims alleging IAC during the sentencing phase.

### III. Conclusion

We hold that the MAR court erred in summarily dismissing Allen's guilt-innocence phase IAC claims without an evidentiary hearing. Because Allen has presented evidence which, if proven true would entitle him to relief, Allen is entitled to an evidentiary hearing in accordance with the mandate of N.C.G.S. § 15A-1420(c)(1) and *McHone*, 348 N.C. at 258. We also hold that the MAR court erred in dismissing Allen's shackling claim as procedurally barred without conducting an evidentiary hearing to establish facts without which the claim could not fairly be resolved. Therefore, we vacate the portions of the MAR court's orders summarily dismissing Claims II, VI, X, XI, XII and the portions of Claim III not addressed during the limited evidentiary hearing, and we remand to the MAR court to conduct an evidentiary hearing. We affirm the MAR court's order dismissing Allen's other claims and subclaims.

AFFIRMED IN PART; VACATED IN PART AND REMANDED.

Justice BERGER dissenting.

*State v. McHone* is the anchor to the majority's claim that it is compelled to remand this case to the trial court for an evidentiary hearing. Contrary to the majority's assertions, this Court did not remand *McHone* for an evidentiary hearing but rather for findings of fact based on materials contained in the record. *See State v. McHone*, 348 N.C. 254, 259, 499 S.E.2d 761, 764 (1998). *McHone*, in clear and unambiguous language, "*remand[ed] this case to that court in order that it may make findings of fact, inter alia,* as to whether defendant or defendant's counsel was served with a copy of the original proposed order." *Id.* (emphasis added). It is only by virtue of the majority's gross misreading of *McHone* that the stunning leap can be made from this language to the requirement of an evidentiary hearing in every motion for appropriate relief.

In addition, the majority claims that *McHone* compels review of motions for appropriate relief "in the light most favorable to the defendant." As discussed further herein, this language cannot be found in *McHone*, N.C.G.S. § 15A-1420, or the official commentary to that section.

The trial court here set forth detailed findings that Claims I, II, IV, V, VI, X, XI, and XII in defendant's motions for appropriate relief were without merit, and therefore, defendant was not entitled to an evidentiary hearing. In doing so, the trial court performed the gatekeeping function contemplated by the plain language of N.C.G.S. § 15A-1420(c) and discussed in *McHone*. The majority opinion, however,

strips trial court judges of this important gatekeeping function. As a result, trial courts will now be forced to spend precious time and resources conducting evidentiary hearings on meritless post-conviction motions.

¶ 79        In addition, the majority breathes life into defendant's newly asserted claim that he was impermissibly shackled during his trial which occurred nearly eighteen years ago. The trial court correctly found that defendant's newly imagined claim was procedurally barred. The majority, however, grants defendant an evidentiary hearing even though there is no evidence that defendant was shackled during his trial, defendant never objected to being shackled at trial, and defendant failed to argue that he was impermissibly shackled in his original appeal.

¶ 80        Furthermore, the majority brings a new form of prejudice into North Carolina's jurisprudence on ineffective assistance of counsel claims: cumulative prejudice. Never has a cumulative prejudice standard been enunciated by this Court in this context, even though we frequently have addressed *Strickland* and ineffective assistance of counsel claims. At least here, however, the majority acknowledges that their "decision to recognize cumulative prejudice claims is based upon our own interpretation of *Strickland* and IAC doctrine[.]"

¶ 81        Because the majority misreads our precedent, misinterprets a straightforward statute, effectively rewrites post-conviction procedure by eliminating no-merit determinations by our trial courts, establishes a new standard by which any question

of fact raised in a motion for appropriate relief would require a full evidentiary hearing, and introduces cumulative prejudice into our ineffective assistance of counsel jurisprudence, I respectfully dissent.

**I. N.C.G.S. § 15A-1420 and *McHone***

¶ 82        Criminal defendants are not entitled to an evidentiary hearing on every claim set forth in a motion for appropriate relief.  *See* N.C.G.S. § 15A-1420(c) (2019).

¶ 83        The majority misreads the unique procedural scenario in *McHone* to support its position that any factual dispute entitles a defendant to an evidentiary hearing. This Court in *McHone* did not grant the defendant an evidentiary hearing as the majority imagines.  *McHone*, 348 N.C. at 259, 499 S.E.2d at 764.  In *McHone*, the defendant made an oral supplemental motion for appropriate relief related to an order entered in a prior hearing on a motion for appropriate relief.  *Id*. at 258, 499 S.E.2d at 763.  The defendant contended that the State had engaged in ex parte contact with the trial court when it submitted a proposed order denying the prior motion for appropriate relief without forwarding a copy to defense counsel.  *Id*.  The defendant asserted that the ex parte communication violated his due process rights. *Id*.  The State did not counter that allegation in the trial court.  *Id*.

¶ 84        However, in response to the defendant's petition for a writ of certiorari with this Court, the State submitted an affidavit with a certified mail return receipt showing that the proposed order had been forwarded to defense counsel, countering

the allegation raised by the defendant with conflicting evidence. *Id*. at 259, 499 S.E.2d at 763–64.

¶ 85        Thus, in *McHone*, the defendant made a meritorious claim in the trial court that his due process rights had been violated. The trial court, without the benefit of the affidavit provided to this Court concerning service of the proposed order, only had before it the defendant's allegations concerning the purported ex parte communication. There was, therefore, a factual question, i.e., whether there was an ex parte communication concerning the order that could only be resolved at that time through hearing evidence from the State and the defendant. If the trial court had been presented with the affidavit from the State concerning service, the factual question could have been resolved without an evidentiary hearing.

¶ 86        This Court acknowledged that the trial court was not obligated to conduct an evidentiary hearing and remanded the case to the trial court, not for an evidentiary hearing but for the entry of findings of fact. *Id*. at 259, 499 S.E.2d at 764. The affidavit provided by the State in its response to the defendant's petition would allow the factual question to be resolved without an evidentiary hearing. The majority simply misapprehends what took place in *McHone*. This Court remanded the case to the trial court, not for an evidentiary hearing, but for entry of findings of fact. *See id*. ("This Court is not the appropriate forum for resolving issues of fact, even though the State's affidavit was filed here. We therefore reverse the order of the trial court and

*remand this case to that court in order that it may make findings of fact, inter alia,* as to whether defendant or defendant's counsel was served with a copy of the original proposed order." (emphasis added)).

Further evidence that *McHone* does not support the majority's claim is found in the plain language of N.C.G.S. § 15A-1420(c), which establishes the framework by which trial courts determine whether an evidentiary hearing is appropriate. That section states:

> (1) Any party is entitled to a hearing on questions of law or fact arising from the motion and any supporting or opposing information presented *unless the court determines that the motion is without merit.* The court must determine, on the basis of these materials and the requirements of this subsection, whether an evidentiary hearing is required to resolve questions of fact. Upon the motion of either party, the judge may direct the attorneys for the parties to appear before him for a conference on any prehearing matter in the case.

> (2) An evidentiary hearing is not required when the motion is made in the trial court pursuant to G.S. 15A-1414, but the court may hold an evidentiary hearing if it is appropriate to resolve questions of fact.

> (3) The court must determine the motion without an evidentiary hearing when the motion and supporting and opposing information present only questions of law. The defendant has no right to be present at such a hearing where only questions of law are to be argued.

> (4) If the court cannot rule upon the motion without the hearing of evidence, it must conduct a hearing for the taking of evidence, and must make findings of fact. The defendant has a right to be present at the evidentiary

hearing and to be represented by counsel. A waiver of the right to be present must be in writing.

(5) If an evidentiary hearing is held, the moving party has the burden of proving by a preponderance of the evidence every fact essential to support the motion.

(6) A defendant who seeks relief by motion for appropriate relief must show the existence of the asserted ground for relief. Relief must be denied unless prejudice appears, in accordance with G.S. 15A-1443.

(7) The court must rule upon the motion and enter its order accordingly. When the motion is based upon an asserted violation of the rights of the defendant under the Constitution or laws or treaties of the United States, the court must make and enter conclusions of law and a statement of the reasons for its determination to the extent required, when taken with other records and transcripts in the case, to indicate whether the defendant has had a full and fair hearing on the merits of the grounds so asserted.

N.C.G.S. § 15A-1420(c) (emphasis added).

The official commentary to this section further clarifies that

[i]t should be noted that the subsections provide for two types of hearings. One is the hearing based upon affidavits, transcripts, or the like, plus matters within the judge's knowledge, to comply with the parties' entitlement to a hearing on questions of law and fact. The other is an evidentiary hearing. G.S. 15A-1420(c)(3) provides that if the only question is a question of law then the matter is to be disposed of without an evidentiary hearing. On the other hand, subdivision (4) makes it clear that if it is necessary to take evidence the court must hold an evidentiary hearing at which the defendant has the right to be present and to be represented by counsel, and the judge must make findings of fact. . . .

> Pursuant to subsections (c)(5) and (6) the moving party has the burden of proof, by a preponderance of evidence, with regard to facts essential to support the motion. The defendant must show the existence of the ground and substantial prejudice must appear. The definition of prejudice is cross-referenced to G.S. 15A-1443, in the Appeal Article, where the State rule on prejudice and the federal constitutional error rule are set out.

N.C.G.S. § 15A-1420, Official Commentary (2019).

¶ 89    "It is well-established that the 'ordinary rules of grammar apply when ascertaining the meaning of a statute, and the meaning must be construed according to the context and approved usage of the language.'" *State v. Fuller*, 376 N.C. 862, 867, 855 S.E.2d 260, 265 (2021) (cleaned up) (quoting *Dunn v. Pac. Emps. Ins. Co.*, 332 N.C. 129, 134, 418 S.E.2d 645, 648 (1992)). Based on the plain language of N.C.G.S. § 15A-1420(c), trial court judges serve as gatekeepers for meritorious motions for appropriate relief. Subsection 15A-1420(c)(1) clearly states that a defendant is only entitled to a hearing on a motion for appropriate relief if the trial court determines there is merit to the motion. *See* N.C.G.S. § 15A-1420(c)(1) ("The court must determine, on the basis of these materials and the requirements of this subsection, whether an evidentiary hearing is required to resolve questions of fact.") However, a determination of merit alone does not guarantee an evidentiary hearing.

¶ 90    As stated in the official commentary, there are two types of hearings: one in which the trial court makes factual or legal determinations based upon the contents of the motion and supporting evidence; and the other, a full evidentiary hearing. The

statute does not demand an evidentiary hearing merely because factual questions are presented in a defendant's motion. Rather, after the trial court has determined that the motion is meritorious, the statute and the official commentary contemplate that an evidentiary hearing is to be conducted only when the trial court determines such a hearing is necessary. *See* N.C.G.S. § 15A-1420(c); N.C.G.S. § 15A-1420, Official Commentary. Thus, an evidentiary hearing is only required when a party's motion (1) has merit, and (2) the trial court determines that it cannot resolve the factual questions based on the materials provided by the moving party.

¶ 91        Contrary to the majority's holding, the trial court here was not "obligated to conduct an evidentiary hearing[.]" The majority misreads the statute, skipping the merits determination and eliminating the ability for a trial court to resolve factual issues based upon the materials submitted without an evidentiary hearing. Instead, the majority merges the two inquiries required by the statute into one determination, holding that the statute requires an evidentiary hearing must be conducted "to resolve disputed issues of fact" regardless of merit.

¶ 92        Moreover, the phrase "disputed issues of fact" does not appear in N.C.G.S. § 15A-1420(c) or the official commentary because the statute and official commentary clearly set forth that merit determinations and hearings may be conducted by the trial court to resolve factual issues short of an evidentiary hearing. *See* N.C.G.S. § 15A-1420(c)(1) ("The court must determine, on the basis of these materials and the

requirements of this subsection, *whether* an evidentiary hearing is required to resolve questions of fact." (emphasis added)).

¶ 93    Thus, a proper and complete reading of *McHone* clearly sets forth, consistent with the plain language of N.C.G.S. § 15A-1420(c), that a defendant's motion for appropriate relief may be dismissed without an evidentiary hearing on questions of law or fact if the trial court determines that the defendant is entitled to no relief, i.e., that the motion has no merit.  The majority's misinterpretation of the statute and gross misreading of *McHone* impermissibly amends N.C.G.S. § 15A-1420(c) and alters the plain language of an otherwise straightforward statute.

**II. Standard of Review**

¶ 94    The majority's misreading of *McHone* and N.C.G.S. § 15A-1420(c) also results in its application of an incorrect standard of review.  By erroneously stating that the summary dismissal of a MAR is reviewed de novo, the majority ignores our precedent and eliminates all deference owed to the trial court.

¶ 95    The trial court's "findings of fact are binding on this Court if they are supported by competent evidence and may not be disturbed absent an abuse of discretion.  The lower court's conclusions of law are reviewed de novo."  *State v. Lane*, 370 N.C. 508, 517, 809 S.E.2d 568, 574 (2018) (cleaned up) (quoting *State v. Gardner*, 227 N.C. App. 364, 365–66, 742 S.E.2d 352, 354 (2013)) (adopting the "analogous standard of review for a denial of a motion for appropriate relief" as the standard of review for denial of

a motion for postconviction DNA testing "because the trial court sits as finder of fact in both circumstances."). Moreover, this Court must refrain from reweighing the evidence and should defer to the trial court's findings of fact which are "binding upon the [defendant] if they [a]re supported by the evidence," even if the evidence is conflicting. *State v. Stevens*, 305 N.C. 712, 719–20, 291 S.E.2d 585, 591 (1982) (citations omitted). Critically, where "findings are supported by the evidence in the record . . . it is not the duty of this Court to reweigh the evidence presented to the trial court." *State v. Johnson*, 371 N.C. 870, 881, 821 S.E.2d 822, 831 (2018).

¶ 96        However, the trial court's determination of merit under N.C.G.S. § 15A-1420(c) is reviewed de novo. *See Lane*, 370 N.C. at 517, 809 S.E.2d at 574.

¶ 97        The majority needlessly muddies the water by conflating our review of the trial court's factfinding with our review of the trial court's legal conclusion that a MAR is without merit. In doing so, the majority eliminates the great deference that must be afforded to the trial court's factual determinations. *See State v. Cummings*, 361 N.C. 438, 447, 648 S.E.2d 788, 794 (2007) ("A trial court abuses its discretion if its determination is manifestly unsupported by reason and is so arbitrary that it could not have been the result of a reasoned decision. In our review, we consider not whether we might disagree with the trial court, but whether the trial court's actions are fairly supported by the record." (cleaned up) (quoting *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) and *Wainwright v. Witt*, 469 U.S. 412, 434

(1985))); *State v. Larrimore*, 340 N.C. 119, 134, 456 S.E.2d 789, 796 (1995) ("According, as we must, great deference to the findings of the trial court, we cannot find error in its findings of facts . . . ." (citations omitted)).

¶ 98        Here, the majority's broad application of de novo review ignores the nuance of our precedent and results in wholesale reweighing of the evidence. The majority further exacerbates this error by also holding that this evidence must be reweighed "in the light most favorable to the defendant[.]" This holding, as with the majority's application of de novo review, is without support in either our General Statutes or our caselaw.

¶ 99        Nowhere in N.C.G.S. § 15A-1420(c) is it stated that the evidence is to be viewed in the light most favorable to the defendant.[1] In fact, N.C.G.S. § 15A-1420(c)(6) states, "[a] defendant who seeks relief by motion for appropriate relief *must show* the existence of the asserted ground for relief." N.C.G.S. § 15A-1420(c)(6) (emphasis added). The official commentary further clarifies that

> [p]ursuant to subsections (c)(5) and (6) the moving party has the burden of proof, by a preponderance of evidence, with regard to facts essential to support the motion. The defendant must show the existence of the ground and prejudice must appear.

---

[1] Interestingly, the majority creates a standard far lower than summary judgment in civil procedure, even though here a jury has already determined defendant's guilt beyond a reasonable doubt. The invented "in the light most favorable to the defendant" standard for disputed factual issues is astoundingly low. This standard is on par with notice pleading in civil procedure. It will be the rare attorney who fails to meet this standard for his client.

N.C.G.S. § 15A-1420, Official Commentary.

¶ 100      The majority contends that *McHone*, 348 N.C. at 258, 499 S.E.2d at 763, supports its "light most favorable to the defendant" language. The entire text of page 258 is set forth as follows:

> [T]he trial court may determine that the motion "is without merit" within the meaning of subsection (c)(1) and deny it without any hearing on questions of law or fact. Defendant's contention that he was entitled to a hearing and entitled to present evidence simply because his motion for appropriate relief was based in part upon asserted denials of his rights under the Constitution of the United States is without merit.
>
> However, defendant also contends in the present case that he was entitled to an evidentiary hearing before the trial court ruled on his motion for appropriate relief as supplemented because some of his asserted grounds for relief required the trial court to resolve questions of fact. We find this contention to have merit. N.C.G.S. § 15A-1420(c)(1) mandates that "[t]he court must determine . . . whether an evidentiary hearing is required to resolve questions of fact." If the trial court "cannot rule upon the motion without the hearing of evidence, it must conduct a hearing for the taking of evidence, and must make findings of fact." N.C.G.S. § 15A-1420(c)(4). Under subsection (c)(4), read *in pari materia* with subsections (c)(1), (c)(2), and (c)(3), an evidentiary hearing is required unless the motion presents assertions of fact which will entitle the defendant to no relief even if resolved in his favor, or the motion presents only questions of law, or the motion is made pursuant to N.C.G.S. § 15A-1414 within ten days after entry of judgment.
>
> At the 9 December 1996 hearing, defendant contended for the first time that in August 1996, the State had sent to the trial court a proposed order denying

> defendant's original motion for appropriate relief without providing defendant with a copy. This matter was not raised or referred to in defendant's original or supplemental motion for appropriate relief. During the 9 December 1996 hearing, the State acknowledged that it did send a proposed order to the trial court and that the trial court signed the State's proposed order dismissing defendant's original motion for appropriate relief. Defendant contended at the 9 December hearing that since neither he nor his counsel were served with a copy of the proposed order, the State had engaged in an improper *ex parte* communication with the trial court in violation of his rights to due process under the state and federal constitutions. Thus, during the 9 December 1996 hearing, defendant orally moved for the first time to have the August 1996 order denying his original motion for appropriate relief vacated because of the *ex parte* contact. The trial court summarily denied that motion and entered its 9 December 1996 order denying defendant's motion for appropriate relief as supplemented.

*McHone*, 348 N.C. at 257–58, 499 S.E.2d at 763 (second and third alterations in original) (citation omitted) (quoting N.C.G.S. § 15A-1420(c)(1) (1997)). As one can plainly see, there is no language or inference which could be drawn from this passage in *McHone* that supports the majority's assertion that we view the evidence in the light most favorable to the defendant when reviewing a summary denial of a MAR.

¶ 101 Additionally, the approach implemented by the majority deviates from other areas of our caselaw which mandate that when a party makes a motion, we view the evidence in the light most favorable to the nonmoving party. *See State v. McNeil*, 359 N.C. 800, 804, 617 S.E.2d 271, 274 (2005) (stating that when a defendant makes a motion to dismiss, " '[t]he reviewing court considers all evidence in the light most

favorable to the State, and the State receives the benefit of every reasonable inference supported by that evidence.' " (quoting *State v. Garcia*, 358 N.C. 382, 412–13, 597 S.E.2d 724, 746 (2004))); *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) ("When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." (citation omitted)); *State v. James*, 321 N.C. 676, 686, 365 S.E.2d 579, 586 (1988) ("In ruling upon a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State, allowing every reasonable inference to be drawn therefrom." (citation omitted)).

¶ 102        The majority's improper application of de novo review eliminates the great deference that should be afforded to the trial court's factual determinations, and the majority's improper reweighing of the evidence nullifies the trial court's merit determination under N.C.G.S. § 15A-1420(c). Further, when combined with the majority's assertion that we must view the evidence in the light most favorable to the defendant, the majority runs afoul of the plain reading of N.C.G.S. § 15A-1420(c) by eliminating any burden for the defendant other than providing notice to the State.

**III. Ineffective Assistance of Counsel**

¶ 103        Defendant filed an MAR and SMAR asserting ineffective assistance of counsel (IAC), among other claims. The trial court found no merit pursuant to N.C.G.S. § 15A-1420 and denied defendant's claims of IAC without an evidentiary hearing.

Defendant contends, and the majority agrees, that he was entitled to an evidentiary hearing on his IAC claims.

¶ 104        A defendant's claim for IAC must satisfy the two prongs of *Strickland v. Washington,* 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. *Id.* at 687. "Deficient performance may be established by showing that counsel's representation fell below an objective standard of reasonableness." *State v. Allen*, 360 N.C. 297, 316, 626 S.E.2d 271, 286 (cleaned up) (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)), *cert. denied*, 549 U.S. 867 (2006). Second, the defendant must show that counsel's deficient performance was prejudicial to his defense. *Strickland*, 466 U.S. at 692. "Generally, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Allen*, 360 N.C. at 316, 626 S.E.2d at 286 (cleaned up) (quoting *Wiggins*, 539 U.S. at 534). When assessing reasonableness, a reviewing court considers "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688.

¶ 105        Describing the hurdle that defendants must overcome to prevail on an IAC claim, this Court has stated that trial "[c]ounsel is given wide latitude in matters of strategy, and the burden to show that counsel's performance fell short of the required

standard is a heavy one for defendant to bear." *State v. McNeill*, 371 N.C. 198, 218–19, 813 S.E.2d 797, 812 (2018) (alteration in original) (quoting *State v. Fletcher*, 354 N.C. 455, 482, 555 S.E.2d 534, 551 (2001)). Decisions concerning trial strategy "are not generally second-guessed by this Court." *State v. Prevatte*, 356 N.C. 178, 236, 570 S.E.2d 440, 472 (2002), *cert. denied*, 538 U.S. 986 (2003) (citation omitted).

¶ 106    Reading the majority opinion, defendant's brief, and listening to defendant's oral argument, one could easily conclude that defendant's two attorneys were grossly incompetent and ill-equipped to handle a murder trial. In reality, the two attorneys who represented defendant at trial, Carl Atkinson and Pierre Oldham, had represented at least twenty-five capital-eligible defendants prior to their representation of defendant. Neither attorney had ever been disciplined by the State Bar or found to have provided IAC.

¶ 107    Atkinson testified at the evidentiary hearing related to the sentencing phase that he frequently consulted with the Center for Death Penalty Litigation about defendant's case.[2] Atkinson stated that his purpose in "dealing with the Center for Death Penalty Litigation was to get any help [he] could in addressing [defendant's] case." Atkinson discussed potential experts with the capital defender, and Atkinson testified that "every time I needed a recommendation of that nature I went to the

---

[2] The Center for Death Penalty Litigation represents defendant, and they argue that the attorneys who sought their advice were ineffective at trial.

Center for Death Penalty Litigation." According to Atkinson, the Center for Death Penalty Litigation "basically believed that [defendant was] likely to be convicted" and that the attorneys should focus on mitigation at sentencing.

¶ 108 Atkinson also attended the "Capital College." According to Atkinson, this was a group of experts from the Center for Death Penalty Litigation and the Academy of Trial Lawyers who met with attorneys handling capital cases. During four days of meetings, attorneys would "present . . . discovery information, all [the] materials to them," and the experts would "go through a process of developing [the] case." Atkinson presented defendant's case to this group of experts.

¶ 109 In addition, defendant attached to his motion for appropriate relief an affidavit from Oldham. Oldham's affidavit stated, in relevant part, the following:

> 3. After being assigned to the case, [co-counsel] and I pursued discovery from the District Attorney and law enforcement agencies. I recall that from the very beginning, we believed that the chief prosecution witness, Vanessa Smith, who claimed to be an eyewitness to the murder, was not telling the truth in her various statements to law enforcement. I also recall that the State's case was based almost entirely on her testimony.
>
> . . . .
>
> 5. *I do not recall* [co-counsel] and me making any strategic decisions concerning the evidence discussed in Claim II of the MAR and SMAR. For example, *I do not recall* an individual named Troy Spencer contacting either [co-counsel] or me prior to trial. If I had known, however, that he claimed that Vanessa Smith had confessed to planning the murder of Christopher Gailey, and that she had shot

and killed him, I would have contacted him, conducted a thorough investigation of his statements, and considered calling him in the guilt phase of the trial.

6. Although I recall our private investigator looking for Mr. Allen's long-time friend, Christina Fowler, *I do not recall* that he ever found her, or that he learned from her that Scott Allen spent most of the night of the murder at her house. Had [co-counsel] and I known that, we would have conducted additional investigation of the alibi evidence and considered calling her as a defense witness in the guilt phase of the trial. *I do not recall* making any strategic decision not to call Ms. Fowler as a witness in either phase of the trial.

7. Similarly, *I do not recall* [co-counsel] and me making any strategic decisions to limit the cross-examination of the State's witnesses, including Vanessa Smith. . . . We did not have an expert crime scene analyst to assist our understanding of the crime scene, or to help us use that information to impeach Ms. Smith's story of the crime. . . .

8. *I have no recollection* of a strategic decision not to call a mental health expert to testify during either phase of the trial. . . .

9. *I also have no recollection* of making a strategic decision to limit our investigation of possible other suspects in the case. I do not recall the evidence of other suspects set forth in Mr. Allen's Claim XI, and do not recall anything about other individuals with a motive to harm Gailey, or their whereabouts on the night of the murder.

(Emphases added.)

¶ 110     The majority finds that Oldham's affidavit, littered with statements that he does not remember what took place, serves as "direct evidence" that "directly undercuts" the MAR court's finding that counsel made a strategic decision. However,

Oldham's affidavit fails to shed *any* light on defendant's claim of ineffective assistance of counsel. The majority nevertheless uses this as the starting point for a chain of assumptions and speculation that it claims provides the factual predicate to an evidentiary hearing. This is in the face of the sworn testimony at trial and defense counsels' reasonable and clearly stated trial strategy of casting doubt on Vanessa Smith's credibility.

¶ 111        Defendant here had the benefit of two experienced attorneys at trial who made the reasonable decision to focus on the credibility of one of the State's witnesses. The attorneys sought advice on strategy and the use of expert witnesses from the Center for Death Penalty Litigation and experts in the field of capital litigation. These experts were confident that defendant would be convicted of capital murder and that defense counsels' best strategy to avoid a death sentence for defendant related to mitigation evidence during the sentencing phase.

¶ 112        Now, nearly eighteen years after his conviction, the Center for Death Penalty Litigation claims the attorneys they coached were ineffective because they did not consult a crime scene expert. However, as the trial court found:

> 51. Defendant also contends that trial counsel was ineffective for failing to call an expert crime scene analyst to testify regarding alleged discrepancies between Smith's testimony and the physical evidence found at the location of Gailey's murder. (SMAR pp. 12–15) In support of this contention, Defendant presents the affidavit and report of Gregg O. McCrary ("McCrary"), a post-conviction crime scene analyst . . . . However, McCrary's report is based

upon the assumption that "[t]he only link between Scott Allen and the murder of Christopher Gailey are the allegations made by Ms. Smith." (SMAR Ex. B of Ex. 41 p. 12) This assumption is faulty as belied by the record.

52. Several other witnesses corroborated Defendant's involvement in the murder. Absent from McCrary's analysis and report are the trial testimony of Harold Blackwelder ("Blackwelder"), Jeffrey Page ("Page"), and Coy Honeycutt ("Honeycutt"). (*See* SMAR Ex. 41) At Defendant's trial, Blackwelder testified that Defendant and Smith arrived at a cookout . . . on 10 July 1999. (T pp. 1748–49) As soon as Defendant and Smith arrived, Blackwelder went outside and saw a white pickup truck matching the description of Gailey's truck provided by Johnson earlier in the trial. (*See* T p. 1749–50; T pp. 1464–65) . . . .

53. . . . Defendant told Page that after Defendant shot the fellow, he "heard the boy groaning, and he also stated that he would throw a rock and when that rock would hit the ground the fellow thought that it was him and the fellow had a gun undoubtedly and went to shooting." (T p. 1781). . . . Also, Defendant told Page "that the reason he shot that boy [was] because he thought that boy was going to rat him off because he was an escapee from Troy prison." (T p. 1785) . . . .

54. . . . [A]ny alleged deficiency of trial counsel and prejudice resulting therefrom regarding counsel's failure to call a crime scene analyst must be viewed in light of Defendant's subsequent statements and actions that link him to Gailey's murder.

. . . .

56. Here, the record supports the conclusion that trial counsels' apparent decision to focus on the doubt created by Smith's gaps in memory, addiction and use of controlled substances on the date of Gailey's death, and failure to

maintain a cohesive timeline, rather than attempting to prove Defendant's innocence through the use of a crime scene analyst was a sound tactical decision. In light of the inculpatory statements Defendant made to Page . . . trial counsels' failure to call an expert crime scene analyst to testify was not an objectively unreasonable decision. Additionally, Defendant has failed to show that he suffered any prejudice from trial counsels' failure to call a crime scene analyst because Defendant's statements to Page, possession of Gailey's truck so soon after Gailey's demise, and willingness to sell the truck for a price far below the fair market value all tended to demonstrate evidence of Defendant's guilt. Therefore, Defendant has failed to show that trial counsel deficiently represented Defendant by committing an objectively unreasonable error or that trial counsels' representation so prejudiced the defense as to deprive Defendant of a fair trial whose result was reliable.

¶ 113    These findings of fact were supported by the evidence presented at trial. The majority gives greater weight to the contrary conclusion in the McCrary Report than it does to the sworn testimony provided at trial. In fact, at trial, Blackwelder testified that defendant arrived at a cookout with a white pickup truck matching the description of Gailey's truck. Defendant told Page that he shot someone in the Uwharrie National Forest and "heard the boy groaning, and he also stated that he would throw a rock and when that rock would hit the ground the fellow thought that it was him and the fellow had a gun undoubtedly and went to shooting." Defendant also told Page that "the reason he shot that boy [was] because he thought that boy was going to rat him off because he was an escapee from Troy prison." Page testified that defendant offered to sell him the truck, matching the description of Gailey's, at

significantly less than fair market value.

¶ 114      Based upon this evidence presented at trial, we cannot say that the trial court erred in finding that "trial counsels' failure to call a crime scene analyst" was not an objectively unreasonable decision. *See Harrington v. Richter*, 562 U.S. 86, 106–07 (2011) (finding that counsel's decisions to forgo the use of experts can be reasonable because counsel was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."). Accordingly, the trial court did not abuse its discretion by resolving the factual issues based upon the evidence presented by defendant and did not err in determining that defendant's IAC claim was without merit.

¶ 115      It should be noted that the majority states that they considered all of defendant's guilt-innocence claims in their entirety. In reality, the majority only considered the above crime-scene-investigation claim. Rather than addressing defendant's other four claims (Claims III, VI, X, and XI) to determine whether an evidentiary hearing is required, the majority simply states that "[h]aving already determined that the MAR court erred in summarily denying one of [defendant's] IAC claims, we need not address his other claims here[.]" Nowhere in N.C.G.S. § 15A-1420 or our caselaw is it stated that if an evidentiary hearing should have been held on one claim, it must be held on all other claims. It is curious that the majority holds that summary dismissal of defendant's claims was error, yet summarily grants an

evidentiary hearing for defendant's claims without analysis and in the face of binding findings of fact by the trial court.

**IV. Shackling Claim**

¶ 116 In Claim XII of his SMAR, defendant alleged that he was impermissibly shackled in the presence of the jury without justification in violation of his statutory and constitutional rights. In support of his claim, defendant produced information from two jurors and from one alternate juror.

¶ 117 The State argued, and the MAR court agreed, that defendant's claim was procedurally barred under N.C.G.S. § 15A-1419(a)(3) because he was in an adequate position to raise the issue on direct appeal but failed to do so. In the alternative, the MAR court concluded that even if defendant's shackling claim was not procedurally barred, it was meritless.

¶ 118 Under both the North Carolina Constitution and the United States Constitution, a defendant may not be visibly shackled in the courtroom in the presence of the jury unless there is a special need for restraints specific to the defendant. *See State v. Tolley*, 290 N.C. 349, 367, 226 S.E.2d 353, 367 (1976); *see also Deck v. Missouri*, 544 U.S. 622, 626 (2005) ("The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal defendant only in the presence of a special need."). Consistent with this constitutional rule, N.C.G.S § 15A-1031 permits a trial court judge to order a

defendant restrained in court only when doing so is "reasonably necessary to maintain order, prevent the defendant's escape, or provide for the safety of persons[,]" and only then after the judge "[e]nter[s] in the record out of the presence of the jury and in the presence of the person to be restrained and his counsel, if any, the reasons for" imposing the restraints and after giving the defendant an opportunity to be heard on the matter. N.C.G.S. § 15A-1031 (2019). Typically, adherence to this mandatory statutory procedure ensures that evidence of a defendant's shackling appears in the record and transcript of trial, enabling the defendant to challenge the judge's decision to impose restraints on direct appeal.

¶ 119 In this case, there is no evidence in the record or transcript suggesting that defendant was restrained during trial. The trial court did not enter factual findings as would have been required prior to ordering defendant shackled under N.C.G.S § 15A-1031. Defendant did not object or otherwise note that he was restrained in a manner visible to the jury.

¶ 120 Relying principally on our decision in *State v. Hyman*, 371 N.C. 363, 817 S.E.2d 157 (2018), defendant contends that his failure to raise any objection to the purported shackling at trial does not preclude post-conviction review. He argues that the procedural bar does not apply when the record is completely silent as to whether the alleged shackling did or did not occur, because when the record is silent, the defendant is not "in a position to adequately raise the ground or issue underlying the

[MAR claim]" within the meaning of N.C.G.S. § 15A-1419(a)(3).

¶ 121      This case is distinguishable from *Hyman*. In *Hyman*, we held that a defendant was not procedurally barred from raising an IAC claim on post-conviction review, even though he had not raised the claim on direct appeal. *Hyman*, 371 N.C. at 385, 817 S.E.2d at 171. The defendant's IAC claim challenged his attorney's failure to withdraw from representing him during trial. *Id.* at 367–68, 817 S.E.2d at 161. The attorney worked at a law firm that had previously represented a witness at the defendant's trial whose testimony inculpated the defendant. *Id.* During cross-examination, an exchange between counsel and the inculpating witness suggested the witness had previously conveyed a different account of the events in question than the one the witness was offering at trial. *Id.* at 365–66, 817 S.E.2d at 160. The defendant argued that his attorney should have withdrawn from the representation and testified regarding the contents of this alleged conversation. *Id.* at 367–68, 817 S.E.2d at 161.

¶ 122      We explained that in order to prove his attorney rendered IAC, the defendant was required to prove numerous facts, including (1) that the alleged pretrial conversation between the witness and the defendant's attorney had in fact occurred, (2) that during the conversation the witness made statements inconsistent with his trial testimony, (3) that the attorney did not have a strategic reason for failing to withdraw from representing the defendant, and (4) that the testimony the attorney

would have been able to deliver would have benefitted the defendant. *Id*. at 384–85, 817 S.E.2d at 170–71. Because "[t]he record developed at trial did not contain any information affirmatively tending to show" any of those facts, we concluded that the record did not "contain[ ] sufficient information to permit the reviewing court to make all the factual and legal determinations necessary to allow a proper resolution of the claim in question." *Id*. at 383–84, 817 S.E.2d at 170. We thus held that the procedural bar provided for in N.C.G.S. § 15A-1419(a)(3) did not apply. *Id*. at 385, 817 S.E.2d at 171.

¶ 123     The distinction between this case and *Hyman* is rooted in a basic difference between an impermissible shackling claim and an IAC claim. To prevail on an impermissible shackling claim, a threshold fact must first be established: that the defendant was shackled at trial. Absent some indication in the record or transcript that the defendant was shackled, it is appropriate to presume that the defendant was not shackled. In the rare case where the defendant is shackled at trial but the shackling is not reflected in the record—because the trial court has failed to adhere to the constitutionally necessary procedural safeguards codified in N.C.G.S § 15A-1031—the defendant possesses all of the information necessary to cure that deficiency, as the defendant knows whether he or she has been subjected to restraints during trial.

¶ 124     By contrast, the same is not true when a defendant brings an IAC claim on

direct appeal. On direct appeal, even a fully developed record will generally fail to contain information without which the claim cannot be adjudicated. When that occurs, the defendant is typically not in a position to fill the necessary gaps in the record. Resolving an IAC claim frequently requires information that necessarily is not a part of the record at trial, namely whether trial counsel made a conscious choice to pursue a given strategy, why that strategy was chosen, and whether that choice was reasonable. Thus, "because of the nature of IAC claims, defendants likely will not be in a position to adequately develop many IAC claims on direct appeal." *State v. Fair*, 354 N.C. 131, 167, 557 S.E.2d 500, 525 (2001).

¶ 125 When presented with a "prematurely asserted" IAC claim, the court "shall dismiss those claims without prejudice to the defendant's right to reassert them during a subsequent MAR proceeding." *Id.*; *see also State v. Hyatt*, 355 N.C. 642, 668, 566 S.E.2d 61, 78 (2002) (dismissing without prejudice IAC claim that is "suggested by the record but [is] insufficiently developed for review"); *State v. Watts*, 357 N.C. 366, 378, 584 S.E.2d 740, 749 (2003) (concluding that defendant did not waive IAC claim because "there are evidentiary issues which may need to be developed before defendant will be in a position to adequately raise his potential IAC claim").

¶ 126 However, the nature of shackling claims renders them usually susceptible to direct review. Accordingly, *Hyman* is fully consistent with application of the procedural bar under the circumstances of this case. *See* N.C.G.S. § 15A-1415,

Official Commentary (2019) ("It should also be taken into account with the latter consideration that additional finality has been added in G.S. 15A-1419 by making it clear that there is but one chance to raise available matters after the case is over, and if there has been a previous assertion of the error, or opportunity to assert the error, by motion or appeal, a later motion may be denied on that basis."); *see also* N.C.G.S. § 15A-1419, Official Commentary (2019) ("[O]nce a matter has been litigated or there has been opportunity to litigate a matter, there will not be a right to seek relief by additional motions at a later date. Thus, this section provides, in short, that if a matter has been determined on the merits upon an appeal, or upon a post-trial motion or proceeding, there is no right to litigate the matter again in an additional motion for appropriate relief. Similarly, if there has been an opportunity to have the matter considered on a previous motion for appropriate relief or appeal the court may deny the motion for appropriate relief.").

## V. Cumulative Error

Next, defendant claims that his alleged IAC claims in his MAR and SMAR amount to cumulative error. The majority rejects our jurisprudence in this area, and the MAR court's conclusion that cumulative error does not apply to IAC claims. While the trial court correctly recognized that such a claim has never been sanctioned by this Court, the majority now proclaims that the "decision to recognize cumulative prejudice claims is based upon our own interpretation of *Strickland* and IAC

doctrine."

¶ 128      While the majority cites to *State v. Thompson*, 359 N.C. 77, 604 S.E.2d 850 (2004); *Williams v. Taylor*, 529 U.S. 362 (2000); and *State v. Lane*, 271 N.C. App. 307, 844 S.E.2d 32 (2020), those cases do not support the proposition that cumulative error applies to IAC claims.

¶ 129      Once again, the majority misreads our precedent. *Thompson* merely reiterated a single argument the defendant was attempting to make and did not recognize nor adopt the defendant's position on cumulative prejudice for IAC claims. *See Thompson*, 359 N.C. at 121–22, 604 S.E.2d at 880. Furthermore, the majority incorrectly asserts that the Supreme Court of the United States recognized cumulative prejudice for IAC claims in *Williams*. In *Williams*, the Supreme Court referred to the cumulation of "the totality of the available mitigation evidence . . . in reweighing it against the evidence in aggravation" and not, as the majority mistakenly asserts, to cumulative error in IAC claims. *Williams*, 529 U.S. at 397–98.

¶ 130      Lastly, the majority employs a North Carolina Court of Appeals case, *Lane*, for the proposition that "courts can consider the cumulative effect of alleged errors by counsel." *Lane*, 271 N.C. App. at 316, 844 S.E.2d at 40. However, Court of Appeals precedent is not binding upon this court. *See State v. Steen*, 376 N.C. 469, 497, 852 S.E.2d 14, 33 (2020) (Earls, J., concurring in result in part and dissenting in part) ("The majority also cites a number of cases from the Court of Appeals; however,

'precedents set by the Court of Appeals are not binding on this Court.' " (quoting *Mazza v. Med. Mut. Ins. Co.*, 311 N.C. 621, 631, 319 S.E.2d 217, 223 (1984))). At no point in our precedent has this Court applied cumulative error to IAC claims, and we should decline to do so now.

## VI. Conclusion

For the reasons stated herein, I respectfully dissent.[3]

Chief Justice NEWBY and Justice BARRINGER join in this dissenting opinion.

---

[3] As to those instances where the majority upholds the trial court's order, I concur in the result only.